COMMONWEALTH *vs.* BARNETT WELANSKY
(and a companion case against the same defendant).

Suffolk.    February 7, 1944. — June 5, 1944.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, RONAN, & SPALDING, JJ.

*Homicide.  Wanton or Reckless Conduct.  Building.  Fire.  Corporation,* Corporate entity, Officers and agents.  *Pleading, Criminal,* Indictment.  *Practice, Criminal,* View, Discretionary control of evidence.  *Evidence,* Photograph, Competency.  *Words,* "Wilful," "Wanton," "Reckless."

At the trial of an indictment charging the defendant with manslaughter in wantonly and recklessly failing to fulfil his duty to use reasonable care to keep the premises of a night club, to which he invited the general public, safe for their use, the mere fact, that the defendant had been absent from the premises for twelve days preceding a fire where deaths occurred owing to a failure to furnish proper exits in the event of a fire, did not require a verdict of not guilty where there was evidence that he was solely responsible for the "system" at the club before his absence, that there had been no change in conditions at the club during his absence, and that he "knew . . . the same system . . . [he] had would continue" during his absence.

A count in an indictment which followed the form for "Manslaughter" appended to G. L. (Ter. Ed.) c. 277, § 79, properly might be used in a case of involuntary manslaughter.

No error appeared in the denial of motions to quash indictments charging the defendant with manslaughter in wantonly and recklessly failing to fulfil his duty to use reasonable care to keep the premises of a

night club, to which he invited the general public, safe for their use, as a result of which deaths occurred on the occasion of a fire, where the indictment, read with specifications by the Commonwealth giving details of such failure, apprised the defendant of the crime charged sufficiently to comply with art. 12 of the Declaration of Rights and fairness to him.

Wanton or reckless conduct as the basis of conviction under an indictment for manslaughter against one in control of premises to which he has invited the public as business visitors may consist of intentional failure to care for their safety in disregard of their right to such care or in disregard of probable harmful consequences to them of such failure.

The use of the word "wilful," prefacing the words "wanton" and "reckless," blurs the concept of wanton or reckless conduct. Per LUMMUS, J.

Discussion by LUMMUS, J., of wanton or reckless conduct.

At common law in this Commonwealth, conduct resulting in death does not become criminal until it passes the borders of negligence and gross negligence and enters into the domain of wanton or reckless conduct. Per LUMMUS, J.

One, who by his wanton or reckless conduct causes injury to another which results in his death, may be found guilty of manslaughter.

To establish guilt under an indictment charging one in control of a night club with manslaughter of patrons whose lives were lost when a fire occurred on the premises and they were unable to escape because of insufficiency of the exits, the Commonwealth was not required to prove that the defendant caused the fire by wanton or reckless conduct, but only that the deaths resulted from his wanton or reckless disregard of the safety of his patrons in the event of fire from any cause.

No error appeared in ordering a view by the jury trying an indictment for manslaughter resulting from a destructive fire in a night club although over three months had passed since the fire, or in admitting in evidence photographs of the premises taken after the fire, where it appeared that material changes from conditions before the fire could have been shown by evidence.

At the trial of an indictment for manslaughter for deaths occurring through a fire in a night club owned by a corporation, the admission of evidence, offered in chief by the Commonwealth, that the defendant was in complete control of the corporation and the premises, including testimony that he gave orders to the corporation's clerk to make and attest records and returns of imaginary meetings and votes, disclosed no error where the matter of control was a live issue in the case until the defendant admitted complete control while testifying in his own behalf.

One who was in complete control of a corporation might properly be indicted and convicted of manslaughter resulting from wanton or reckless conduct on his part although the corporation also might have been indicted and convicted therefor.

Evidence, at the trial of an indictment for manslaughter against one in control of the construction and maintenance of a night club, that the defendant deliberately failed to instal fire doors called for on plans of

the premises approved by the municipal building department was properly admitted, with other evidence showing deliberate failure of the defendant to care for the safety of his patrons by providing proper exits in case of fire, as showing wanton or reckless conduct on his part causing the death of numerous patrons through a fire occurring in the club.

The admission of evidence of defective wiring as part of the evidence introduced in chief by the Commonwealth at the trial of an indictment against one in control of a night club for manslaughter resulting from a fire on the premises, was proper at the time of its admission and disclosed no error although the Commonwealth subsequently failed to introduce any evidence that the defendant knew or had reason to know of such defect or that it had any causal relation to the fire.

INDICTMENTS found and returned on December 31, 1942, charging manslaughter.

The indictments were tried before *Hurley*, J., on March 16 to April 10, 1943, inclusive. After conviction the defendant appealed, filing one hundred twenty-four assignments of error. Among such assignments were the following:

106. The refusal to give the following instruction requested by the defendant: "The fact that the fire started in the New Cocoanut Grove, Inc. is not evidence that it was started by the defendant, nor is any criminal liability for the fire attached to the defendant solely because he was an officer of the corporation."

108. The refusal to give the following instruction requested by the defendant: "If the death or deaths of the persons named resulted from the fire, and the fire was started by someone other than the defendant and not because of the defendant's acts or failure to act, then he must be found not guilty."

111. The refusal to give the following instruction requested by the defendant: "If the jury finds that the acts or omissions of the defendant, even though wanton and reckless on his part, were not the cause of the fire, and the fire caused the deaths . . . the defendant must be found not guilty."

105. The denial and refusal to grant the motion of the defendant that the court direct the jury to return a verdict of not guilty as to each count submitted to them.

109. The refusal to give the following instruction requested by the defendant: "If the jury finds that the deceased . . . were unable to make their way to any door or window, or any exit, by reason of being overcome by fire, flame, heat, smoke or gases, it cannot be found that the defect, if any, of egresses was the proximate cause of the deaths."

114. The refusal to give the following instruction requested by the defendant: "Unless you find on all the evidence that any reasonable man would have foreseen or anticipated that the fire in New Cocoanut Grove would be started and act as you find it acted, the defendant cannot be convicted of causing the deaths."

122. An instruction to the jury in the charge that they could consider, and should so do, the state of mind of the defendant, not at the time the calamity occurred, on November 28, 1942, "but for any period of time prior thereto in determining whether or not . . . [his] conduct indicated an utter indifference to the rights of parties as if those rights did not exist."

The cases were argued at the bar in February, 1944, before *Field*, C.J., *Donahue*, *Lummus*, *Dolan*, & *Ronan*, JJ., and after the retirement of *Donahue* & *Cox*, JJ., were submitted on briefs to *Qua* & *Spalding*, JJ.

*D. J. Gallagher*, (*H. F. Callahan*, *E. M. Dangel*, *T. N. Creed*, & *A. C. Webber* with him,) for the defendant.

*F. T. Doyle*, Assistant District Attorney, (*J. K. Collins* & *A. H. Salisbury*, Assistant Attorneys General, with him,) for the Commonwealth.

LUMMUS, J.  On November 28, 1942, and for about nine years before that day, a corporation named New Cocoanut Grove, Inc., maintained and operated a "night club" in Boston, having an entrance at 17 Piedmont Street, for the furnishing to the public for compensation of food, drink, and entertainment consisting of orchestra and band music, singing and dancing.  It employed about eighty persons. The corporation, its officers and employees, and its business, were completely dominated by the defendant Barnett Welansky, who is called in this opinion simply the defendant,

since his codefendants were acquitted by the jury. He owned, and held in his own name or in the names of others, all the capital stock. He leased some of the land on which the corporate business was carried on, and owned the rest, although title was held for him by his sister. He was entitled to, and took, all the profits. Internally, the corporation was operated without regard to corporate forms, as though the business were that of the defendant as an individual. It was not shown that responsibility for the number or condition of safety exits had been delegated by the defendant to any employee or other person.

The defendant was accustomed to spend his evenings at the night club, inspecting the premises and superintending the business. On November 16, 1942, he became suddenly ill, and was carried to a hospital, where he was in bed for three weeks and remained until discharged on December 11, 1942. During his stay at the hospital, although employees visited him there, he did not concern himself with the night club, because, as he testified, he "knew it would be all right" and that "the same system . . . [he] had would continue" during his absence. There is no evidence of any act, omission or condition at the night club on November 28, 1942, (apart from the lighting of a match hereinafter described), that was not within the usual and regular practice during the time before the defendant was taken ill when he was at the night club nearly every evening. While the defendant was at the hospital, his brother James Welansky and an employee named Jacob Goldfine, who were made codefendants, assumed some of the defendant's duties at the night club, but made no change in methods. Under these circumstances the defendant was not entitled to a verdict of not guilty on the ground that any acts or omissions on the evening of November 28, 1942, were the transitory and unauthorized acts or omissions of servants or other persons, for which the defendant could not be held criminally responsible. *Commonwealth* v. *Stevens*, 153 Mass. 421. *Commonwealth* v. *Anthony*, 306 Mass. 470, 478.

The physical arrangement of the night club on November 28, 1942, as well as on November 16, 1942, when the defend-

ant last had personal knowledge of it, was as follows. The total area of the first or street floor was nine thousand seven hundred sixty-three square feet. Entering the night club through a single revolving door at 17 Piedmont Street, one found himself in a foyer or hall having an area of six hundred six square feet. From the foyer, there was access to small rooms used as toilets, to a powder room and a telephone room, to a small room for the checking of clothing, and to another room with a vestibule about five feet by six feet in size adjoining it, both of which were used as an office in the daytime and for the checking of clothing in the evening. In the front corner of the foyer, to the left, beyond the office, was a passageway leading to a stairway about four feet wide, with fifteen risers. That stairway led down to the Melody Lounge in the basement, which was the only room in the basement open to the public. There were to be found a bar, tables and chairs.

The extreme dimensions of the Melody Lounge were about thirty-six feet by fifty-five feet, and its area was one thousand eight hundred ninety-five square feet. It was separated from a narrow corridor leading to the kitchen (which was located under the main dining room) by a wooden partition. In that partition was a wooden door, two feet and two inches wide, which could have been found to be unmarked. Passing from the Melody Lounge through that door, and thus entering the narrow corridor, one could turn to the left and go to a door which swung inward and could be opened only to a width of eighteen inches, at the top of three steps. That door was barred by a wooden bar that had to be lifted off before the door could be opened at all. On opening that door, one could pass into an outdoor alley about three and one half feet wide. That alley led to a yard, from which egress could be had through in-swinging doors into another passageway and thence to Shawmut Street.

If, instead, one passing from the Melody Lounge into the narrow corridor should turn to the right, he might pass, as employees were accustomed to do, through a door two and one half feet wide swinging into the corridor from the kitchen. Once in the kitchen, he could traverse that room with all its

equipment to the other end of it near Shawmut Street, and then go upstairs and through swinging doors into a corner of the main dining room.

It is evident that in an emergency escape from the Melody Lounge by either of these courses would be difficult for a patron not thoroughly familiar with parts of the premises not ordinarily open to him.

Returning to the foyer, and standing as though one had just entered it by the revolving door, to the right, in the front of the building on Piedmont Street, was a room called the Caricature Bar, with an area of one thousand three hundred ninety-nine square feet, containing two bars, stools and chairs.   Toward Shawmut Street, and separated from the Caricature Bar by a railing, was the main dining room, with an area of three thousand seven hundred sixty-five square feet.   The foyer opened into both the Caricature Bar and the main dining room.   In the main dining room was a dance floor with an area of six hundred sixty square feet, and behind it, in the direction of Broadway, was a stage with an area of four hundred thirty-six square feet.

From the Caricature Bar and from the main dining room one could pass into a corridor near the stage, about four feet wide, up some steps, and through a passageway about seven feet wide into the new Cocktail Lounge, which was first opened on November 17, 1942, and which had an area of seven hundred eighty-one square feet.   There one found a bar, stools, tables and seats, and also a check room and toilets.   In the farther corner of the Cocktail Lounge was a door three feet wide, swinging inward, through which one could enter a small vestibule from which he could go through a pair of doors to Broadway at 59 Broadway.

That pair of doors, and the revolving door at 17 Piedmont Street, were the only entrances and exits intended for the ordinary use of patrons.   Besides those doors, and the exit through the wooden partition from the Melody Lounge, already described, there were five possible emergency exits from the night club, all on the first or street floor.   These will now be listed and described.

(1) A door, opening outward to Piedmont Street, two

and one half feet wide, at the head of the stairway leading to and from the basement Melody Lounge. That door apparently was not visible from the greater part of the foyer, for it was in a passageway that ran from one end of the foyer past the office to the stairway. That door was marked "Exit" by an electric sign. It was equipped with a "panic" or "crash" bar, intended to unbolt and open the door upon pressure from within the building. But on the evidence it could have been found that the device just mentioned was regularly made ineffective by having the door locked by a separate lock operated by a key that was kept in a desk in the office. Late in the evening of November 28, 1942, firemen found that door locked and had to force it open with an axe. The jury were entitled to disbelieve the testimony of the defendant that he had instructed the head waiter, who died in the occurrence of that evening, always to keep that door unlocked. It may be observed that if that door should be left so that it could be opened by means of the panic bar, a patron might leave through that door without paying his bill. It does not appear that anyone watched that door to prevent patrons from so doing.

(2) A door two and one third feet wide leading from the foyer, near the revolving door, into the small vestibule adjoining the office, already described. From that vestibule another similar door, swinging inward, gave egress to Piedmont Street, near the revolving door. The door to Piedmont Street could not be opened fully, because of a wall shelf. And that door was commonly barred in the evening, as it was on November 28, 1942, by a removable board with clothing hooks on it, and by clothing, for in the evening the office and vestibule were used for checking clothing.

(3) A door, opening outward, from the middle of the wall of the main dining room to Shawmut Street, and marked "Exit" by an electric sign. The opening was about three and two thirds feet wide. The defendant testified that this was the principal exit provided for emergencies. From the sides of the opening hung double doors, equipped with "panic" bars intended to unbolt and open the doors upon pressure from within. But on the evening of November 28,

1942, one of the two doors did not open upon pressure, and had to be hammered with a table before it would open. Besides, the "panic" doors were hidden from the view of diners ·by a pair of "Venetian" wooden doors, swinging inward, and fastened by a hook, which had to be opened before one could operate the "panic" doors. In addition, dining tables were regularly placed near the Venetian doors, one of them within two feet, and these had to be moved away in order to get access to the doors. That condition prevailed on the evening of November 28, 1942.

(4) The service door, two and one half feet wide, swinging inward, leading to Shawmut Street at 8 Shawmut Street. This door was near the stage, at the foot of a stairway leading to dressing rooms on the second floor, and was in a part of the premises to which patrons were not admitted and which they could not see. This door was known to employees, but doubtless not to patrons. It was kept locked by direction of the defendant, and the key was kept in a desk in the office.

(5) The door, two and three fourths feet wide, swinging inward, leading from a corridor into which patrons had no occasion to go, to Shawmut Street at 6 Shawmut Street. No patron was likely to know of this door. It was kept locked by direction of the defendant, but he ordered the key placed in the lock at seven every evening.

We now come to the story of the fire. A little after ten o'clock on the evening of Saturday, November 28, 1942, the night club was well filled with a crowd of patrons. It was during the busiest season of the year. An important football game in the afternoon had attracted many visitors to Boston. Witnesses were rightly permitted to testify that the dance floor had from eighty to one hundred persons on it, and that it was "very crowded." *Beverley* v. *Boston Elevated Railway*, 194 Mass. 450, 457. Witnesses were rightly permitted to give their estimates, derived from their observations, of the number of patrons in various parts of the night club. Upon the evidence it could have been found that at that time there were from two hundred fifty to four hundred persons in the Melody Lounge, from four hundred

to five hundred in the main dining room and the Caricature
Bar, and two hundred fifty in the Cocktail Lounge. Yet it
could have been found that the crowd was no larger than it
had been on other Saturday evenings before the defendant
was taken ill, and that there had been larger crowds at
earlier times. There were about seventy tables in the din-
ing room, each seating from two to eight persons. There
was testimony that all but two were taken. Many persons
were standing in various rooms. The defendant testified
that the reasonable capacity of the night club, exclusive of
the new Cocktail Lounge, was six hundred fifty patrons. He
never saw the new Cocktail Lounge with the furniture in-
stalled, but it was planned to accommodate from one hun-
dred to one hundred twenty-five patrons.

A bartender in the Melody Lounge noticed that an elec-
tric light bulb which was in or near the cocoanut husks of an
artificial palm tree in the corner had been turned off and
that the corner was dark. He directed a sixteen year old
bar boy who was waiting on customers at the tables to
cause the bulb to be lighted. A soldier sitting with other
persons near the light told the bar boy to leave it unlighted.
But the bar boy got a stool, lighted a match in order to see
the bulb, turned the bulb in its socket, and thus lighted it.
The bar boy blew the match out, and started to walk away.
Apparently the flame of the match had ignited the palm
tree and that had speedily ignited the low cloth ceiling near
it, for both flamed up almost instantly. The fire spread with
great rapidity across the upper part of the room, causing
much heat. The crowd in the Melody Lounge rushed up the
stairs, but the fire preceded them. People got on fire while
on the stairway. The fire spread with great speed across
the foyer and into the Caricature Bar and the main dining
room, and thence into the Cocktail Lounge. Soon after the
fire started the lights in the night club went out. The smoke
had a peculiar odor. The crowd were panic stricken, and
rushed and pushed in every direction through the night club,
screaming, and overturning tables and chairs in their
attempts to escape.

The door at the head of the Melody Lounge stairway

was not opened until firemen broke it down from outside with an axe and found it locked by a key lock, so that the panic bar could not operate. Two dead bodies were found close to it, and a pile of bodies about seven feet from it. The door in the vestibule of the office did not become open, and was barred by the clothing rack. The revolving door soon jammed, but was burst out by the pressure of the crowd. The head waiter and another waiter tried to get open the panic doors from the main dining room to Shawmut street, and succeeded after some difficulty. The other two doors to Shawmut Street were locked, and were opened by force from outside by firemen and others. Some patrons escaped through them, but many dead bodies were piled up inside them. A considerable number of patrons escaped through the Broadway door, but many died just inside that door. Some employees, and a great number of patrons, died in the fire. Others were taken out of the building with fatal burns and injuries from smoke, and died within a few days.

I. *The pleadings, verdicts, and judgments.*

The defendant, his brother James Welansky, and Jacob Goldfine, were indicted for manslaughter in sixteen counts of an indictment numbered 413, each count for causing the death of a person described as "Jane Doe," "John Doe," or the like. The first six counts were quashed, leaving the last ten counts. Later a motion by the Commonwealth was allowed, substituting in each of the last ten counts the real name of a victim. See *Commonwealth* v. *DiStasio,* 294 Mass. 273, 278, 279. Voluntarily the Commonwealth filed specifications as to those counts, by which it specified among other things that the alleged misconduct of the defendant consisted in causing or permitting or failing reasonably to prevent defective wiring, the installation of inflammable decorations, the absence of fire doors, the absence of "proper means of egress properly maintained" and "sufficient proper" exits, and overcrowding. Some other specifications — such as failure to prevent the unlawful employment of minors — plainly had little or no relation

to any wanton or reckless conduct that might result in manslaughter. The Commonwealth refused to specify as requested by the defendant what statutes, what "provisions of" the common law, or what ordinances, had been violated. The Commonwealth did specify the nature of the mortal injuries suffered by the different victims, all of whom were patrons, and the harmful consequences to which acts or omissions of the defendant exposed the several victims and which could have been foreseen by the defendant. The judge refused to require further specifications.

The defendant moved to quash each count because (1) when read with the specifications it sets out no crime, and (2) when read with the specifications it does not fully, plainly, substantially and formally set out any crime as required by art. 12 of the Declaration of Rights. Each of the counts numbered from 7 to 12 inclusive as amended alleged in substance that the New Cocoanut Grove, Inc., a corporation, did for a period of time prior to and including November 28, 1942, maintain and operate a night club, to which it invited members of the general public; that it was under a legal duty to its invitees to use reasonable care to keep its premises safe for their use; that the three persons indicted were authorized by the corporation to maintain, control, operate, construct, alter, supervise, and manage its premises in its behalf; that said three persons accepted the responsibility for such acts, and were therefore under a duty to its invitees to use such reasonable care; that in reckless disregard of such duty to one (naming the victim) who was lawfully upon said premises pursuant to such invitation to the general public, and of the probable harmful consequences to him of their failure to perform said duty, they and each of them did "wilfully, wantonly and recklessly neglect and fail to fulfil their said legal duty and obligation to the said" victim, by reason whereof he on November 28, 1942, received a mortal injury, as a result of which on that day he died.

Each of the thirteenth and fourteenth counts is in shorter form, and alleges in substance that the three persons indicted and each of them on November 28, 1942, did "main-

tain, manage, operate and supervise certain premises," describing them, "and solicited and invited the patronage of the public to the said premises"; that at the aforesaid time and place the named victim was lawfully upon the aforesaid premises as a customer on the said invitation, and that the three persons indicted and each of them did "assault and beat" the said victim, and by said assault and beating did kill him "by wilfully, wantonly and recklessly maintaining, managing, operating and supervising the said premises." Each of counts 15 and 16 alleges merely that the defendants assaulted and beat a named victim and by such assaulting and beating did kill the victim.

Another indictment numbered 414 in sixteen counts was returned against the same three persons. The first six counts were quashed, and a verdict of not guilty was directed upon the sixteenth count. That left nine counts, numbered 7 to 15 inclusive. Counts 7 to 14 inclusive were substantially like counts 7 to 14 inclusive in the indictment numbered 413, except for the names of the victims. Count 15 was a short count alleging that the three persons indicted "on the twenty-eighth day of November in the year of our Lord one thousand nine hundred and forty-two, did, all and each of them, assault and beat one Eleanor Chiampa, and by such assault and beating, did kill the said Eleanor Chiampa." That count followed the form of an indictment for "Manslaughter" appended to G. L. (Ter. Ed.) c. 277, § 79. That form could properly be used even in a case of involuntary manslaughter. *Commonwealth* v. *Arone*, 265 Mass. 128. Upon this indictment the Commonwealth furnished specifications substantially like those furnished upon indictment 413.

The motions to quash certain counts of these indictments were properly denied. The judge was bound to require a bill of particulars only to the extent that without it the indictment would be deficient in that the offence charged would not be "fully, plainly, substantially and formally set out," as required by art. 12 of the Declaration of Rights. G. L. (Ter. Ed.) c. 277, § 40. *Commonwealth* v. *Snell*, 189 Mass. 12, 18, 19. *Commonwealth* v. *Sinclair*, 195 Mass.

100, 105–108. *Commonwealth* v. *Massad,* 242 Mass. 532. Beyond that the requirement of particulars or specifications was discretionary. *Commonwealth* v. *King,* 202 Mass. 379, 384. *Commonwealth* v. *Bartolini,* 299 Mass. 503, 509. *Commonwealth* v. *Hayes,* 311 Mass. 21. The defendant had the benefit of specifications that were fully as complete and detailed as were necessary for compliance with the Constitution or for fairness to him. *Commonwealth* v. *Wakelin,* 230 Mass. 567, 571. *Commonwealth* v. *Lammi,* 310 Mass. 159. For constitutional purposes "all that is required is that the indictment, read with the bill of particulars, be sufficient fully, plainly, substantially and formally to give the defendant reasonable knowledge of the crime with which he is charged." *Commonwealth* v. *Hayes,* 311 Mass. 21, 25. *Commonwealth* v. *Gedzium,* 259 Mass. 453, 457. *Commonwealth* v. *Albert,* 307 Mass. 239, 243. There is nothing in the motions to quash. There is still less, if that were possible, in the belated attempt to raise the same question of pleading by motion in arrest of judgment. *Commonwealth* v. *McKnight,* 283 Mass. 35, 38, 39.

The defendant was found guilty upon counts 7 to 16 inclusive of indictment 413 and upon counts 7 to 15 inclusive of indictment 414. He was sentenced to imprisonment in the State prison upon each count for a term of not less than twelve years and not more than fifteen years, the first day of said term to be in solitary confinement and the residue at hard labor (G. L. [Ter. Ed.] c. 279, § 29), the sentences to run concurrently. Upon a motion for a stay in the execution of the sentences, a stay was denied. G. L. (Ter. Ed.) c. 279, § 4, as amended by St. 1935, c. 50, § 3. The cases come here under G. L. (Ter. Ed.) c. 278, §§ 33A–33G, upon an appeal, a transcript of the evidence, a summary of the record, and an assignment of one hundred twenty-four alleged errors.

II. *The principles governing liability.*

The Commonwealth disclaimed any contention that the defendant intentionally killed or injured the persons named in the indictments as victims. It based its case on invol-

untary manslaughter through wanton or reckless conduct. The judge instructed the jury correctly with respect to the nature of such conduct.[1]

Usually wanton or reckless conduct consists of an affirmative act, like driving an automobile or discharging a firearm, in disregard of probable harmful consequences to another. But where, as in the present case, there is a duty of care for the safety of business visitors invited to premises which the defendant controls,[2] wanton or reckless conduct may consist of intentional failure to take such care in disregard of the probable harmful consequences to them or of their right to care. *Aiken* v. *Holyoke Street Railway,* 184 Mass. 269, 271. *Banks* v. *Braman,* 188 Mass. 367, 369. *Queen* v. *Senior,* [1899] 1 Q. B. 283. *State* v. *Benton,* 38 Del. 1. Am. Law Inst. Restatement: Torts, § 500. 26 Am. Jur. Homicide, §§ 205–208. 29 C. J. 1154, et seq.

To define wanton or reckless conduct so as to distinguish it clearly from negligence and gross negligence is not easy. *Banks* v. *Braman,* 188 Mass. 367, 370. *Commonwealth* v. *Arone,* 265 Mass. 128, 132. Sometimes the word "wilful" is prefaced to the words "wanton" and "reckless" in expressing the concept. That only blurs it. Wilful means intentional. In the phrase "wilful, wanton or reckless conduct," if "wilful" modifies "conduct" it introduces

---

[1] In the only comparable case known in this Commonwealth, the jury were similarly instructed. That was the case of Commonwealth *v.* Hendrick, & others, tried in the Superior Court in Suffolk County in August, 1925, a case of alleged manslaughter arising out of the collapse of a night club building called the Pickwick Club, which happened on July 4, 1925. A copy of the charge is in the Social Law Library. The case did not come to this court.

The following cases involved manslaughter arising out of the collapse of a building. *People* v. *Buddensieck,* 103 N. Y. 487. *State* v. *Ireland,* 126 N. J. L. 444.

The following cases involved manslaughter arising out of a fire. *Commonwealth* v. *Rhoads,* 20 Penn. Dist. R. 149. See also *Miller* v. *Strahl,* 239 U. S. 426.

[2] Compare the case of an employer who at common law owes no duty to his employees to make his factory safer than it appeared to be when the employment began, because they contractually assumed the risk. *Jones* v. *Granite Mills,* 126 Mass. 84. *Keith* v. *Granite Mills,* 126 Mass. 90. *Pauley* v. *Steam Gauge & Lantern Co.* 131 N. Y. 90. *Huda* v. *American Glucose Co.* 154 N. Y. 474. In those cases recovery by a servant against his master for injury caused by fire in a factory was denied. See also *Wainwright* v. *Jackson,* 291 Mass. 100; *Little* v. *Lynn & Marblehead Real Estate Co.* 301 Mass. 156. In *Cloutier* v. *Oakland Park Amusement Co.* 129 Maine, 454, the court failed to distinguish between such cases and the case of an invited business visitor.

something different from wanton or reckless conduct, even though the legal result is the same. Wilfully causing harm is a wrong, but a different wrong from wantonly or recklessly causing harm. If "wilful" modifies "wanton or reckless conduct" its use is accurate. What must be intended is the conduct, not the resulting harm. *Altman* v. *Aronson*, 231 Mass. 588, 592. *Banks* v. *Braman*, 188 Mass. 367, 369. The words "wanton" and "reckless" are practically synonymous in this connection, although the word "wanton" may contain a suggestion of arrogance or insolence or heartlessness that is lacking in the word "reckless." But intentional conduct to which either word applies is followed by the same legal consequences as though both words applied.

The standard of wanton or reckless conduct is at once subjective and objective, as has been recognized ever since *Commonwealth* v. *Pierce*, 138 Mass. 165. Knowing facts that would cause a reasonable man to know the danger is equivalent to knowing the danger. *Banks* v. *Braman*, 188 Mass. 367, 369. *Romana* v. *Boston Elevated Railway*, 218 Mass. 76, 83. *Commonwealth* v. *Peach*, 239 Mass. 575. *Nash* v. *United States*, 229 U. S. 373, 377. *Arizona Employer's Liability Cases*, 250 U. S. 400, 432. Am. Law Inst. Restatement: Torts, § 500, and also comments c and f. See also *Brennan* v. *Schuster*, 288 Mass. 311. The judge charged the jury correctly when he said, "To constitute wanton or reckless conduct, as distinguished from mere negligence, grave danger to others must have been apparent, and the defendant must have chosen to run the risk rather than alter his conduct so as to avoid the act or omission which caused the harm. If the grave danger was in fact realized by the defendant, his subsequent voluntary act or omission which caused the harm amounts to wanton or reckless conduct, no matter whether the ordinary man would have realized the gravity of the danger or not. But even if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct in his dangerous act or omission, if an ordinary normal

man under the same circumstances would have realized the
gravity of the danger.  A man may be reckless within the
meaning of the law although he himself thought he was
careful."

The essence of wanton or reckless conduct is intentional
conduct, by way either of commission or of omission where
there is a duty to act, which conduct involves a high degree
of likelihood that substantial harm will result to another.
Am. Law Inst. Restatement: Torts, § 500.  *LeSaint* v.
*Weston,* 301 Mass. 136, 138.  Wanton or reckless conduct
amounts to what has been variously described as indifference
to or disregard of probable· consequences to that other
(*Aiken* v. *Holyoke Street Railway,* 184 Mass. 269, 271; *Free-
man* v. *United Fruit Co.* 223 Mass. 300, 302; *Banks* v.
*Braman,* 188 Mass. 367, 369; *Yancey* v. *Boston Elevated
Railway,* 205 Mass. 162, 171; *Burns's Case,* 218 Mass. 8,
10; *Romana* v. *Boston Elevated Railway,* 218 Mass. 76, 83;
*Sullivan* v. *Napolitano,* 277 Mass. 341, 344) or the rights of
that other.  *Warren* v. *Pazolt,* 203 Mass. 328, 347.  *Com-
monwealth* v. *Horsfall,* 213 Mass. 232, 235.  *Cohen* v. *Davies,*
305 Mass. 152, 155, 156.  But we are not prepared to give
unqualified approval to a further statement found in some
of our reported decisions, for example in *Query* v. *Howe,* 273
Mass. 92, 96, that to constitute wanton or reckless conduct,
disregard of the rights of another must be as complete or
utter as though such rights did not exist.  If taken literally,
that statement would permit a trifling regard for the rights
of another to exonerate a defendant from the criminal con-
sequences of flagrant wrongdoing.

The words "wanton" and "reckless" are thus not merely
rhetorical or vituperative expressions used instead of negli-
gent or grossly negligent.  They express a difference in the
degree of risk and in the voluntary taking of risk so marked,
as compared with negligence, as to amount substantially
and in the eyes of the law to a difference in kind.  *Banks* v.
*Braman,* 188 Mass. 367.  *Cotter, petitioner,* 237 Mass. 68, 72.
*Adamowicz* v. *Newburyport Gas & Electric Co.* 238 Mass. 244,
246.  *Prondecka* v. *Turners Falls Power & Electric Co.* 238
Mass. 239, 242; *S. C.* 241 Mass. 100, 102.  *McIntyre* v. *Con-*

*verse,* 238 Mass. 592, 594. *Young* v. *Worcester,* 253 Mass. 481, 484. *Potter* v. *Gilmore,* 282 Mass. 49, 57. Am. Law Inst. Restatement: Torts, § 500, comment g. For many years this court has been careful to preserve the distinction between negligence and gross negligence, on the one hand, and wanton or reckless conduct on the other. *Prondecka* v. *Turners Falls Power & Electric Co.* 238 Mass. 239; *S. C.* 241 Mass. 100. Compare *Jamison* v. *Encarnacion,* 281 U. S. 635; *Alpha Steamship Corp.* v. *Cain,* 281 U. S. 642. In pleadings as well as in statutes the rule is that "negligence and wilful and wanton conduct are so different in kind that words properly descriptive of the one commonly exclude the other." *Miller* v. *United States Fidelity & Guaranty Co.* 291 Mass. 445, 447. *Romana* v. *Boston Elevated Railway,* 226 Mass. 532, 536.

Notwithstanding language used commonly in earlier cases, and occasionally in later ones,[1] it is now clear in this Commonwealth that at common law conduct does not become criminal until it passes the borders of negligence and gross negligence and enters into the domain of wanton or reckless conduct. There is in Massachusetts at common law no such thing as "criminal negligence." *Commonwealth* v. *Guillemette,* 243 Mass. 346. *Commonwealth* v. *Arone,* 265 Mass. 128. *Commonwealth* v. *Jones,* 288 Mass. 150, 152.

---

[1] In early cases what is now known as wanton or reckless conduct was variously described as wilful negligence, wanton negligence, gross negligence, and culpable negligence, as was pointed out in *Bjornquist* v. *Boston & Albany Railroad,* 185 Mass. 130, 134, and *Banks* v. *Braman,* 188 Mass. 367, 370. So in criminal cases what was necessary to make conduct criminal was often so described. The expression "criminal negligence" was often used. But it seems that what we now know as wanton or reckless conduct was in fact required. The terminology, not the law, is what has changed. *Commonwealth* v. *Hartwell,* 128 Mass. 415. *Commonwealth* v. *Pierce,* 138 Mass. 165. *Commonwealth* v. *Hawkins,* 157 Mass. 551. *Lanci* v. *Boston Elevated Railway,* 197 Mass. 32, 35. *Romana* v. *Boston Elevated Railway,* 218 Mass. 76, 84. *Commonwealth* v. *McCan,* 277 Mass. 199, 203. At least one statute purports to impose criminal liability for "gross negligence." G. L. (Ter. Ed.) c. 265, § 30. Whether that expression really means wanton or reckless conduct has not been decided.

In other jurisdictions a variety of similar expressions has been used in describing conduct that will create criminal liability. But in many of them the substantial equivalent of wanton or reckless conduct is required. *People* v. *Angelo,* 246 N. Y. 451. *Regina* v. *Elliott,* 16 Cox C. C. 710. *People* v. *Burgard,* 377 Ill. 322. *People* v. *Lynn,* 385 Ill. 165. *State* v. *Cope,* 204 N. C. 28. *State* v. *Studebaker,* 334 Mo. 471. *State* v. *Sawyers,* 336 Mo. 644. *Bell* v. *Commonwealth,* 170 Va. 597. *State* v. *Whatley,* 210 Wis. 157; 99 Am. L. R. 749. 29 C. J. 1154, et seq.

*Minasian* v. *Aetna Life Ins. Co.* 295 Mass. 1, 5. *Commonwealth* v. *Maguire*, 313 Mass. 669.

Wanton or reckless conduct is the legal equivalent of intentional conduct. *Aiken* v. *Holyoke Street Railway*, 184 Mass. 269, 271. *Banks* v. *Braman*, 188 Mass. 367, 369. *McIntyre* v. *Converse*, 238 Mass. 592, 594. *Sullivan* v. *Napolitano*, 277 Mass. 341. *Isaacson* v. *Boston, Worcester & New York Street Railway*, 278 Mass. 378, 387. *Baines* v. *Collins*, 310 Mass. 523, 526. Am. Law Inst. Restatement: Torts, § 282, comment d. If by wanton or reckless conduct bodily injury is caused to another, the person guilty of such conduct is guilty of assault and battery. *Commonwealth* v. *Hawkins*, 157 Mass. 551. *Commonwealth* v. *Gorman*, 288 Mass. 294, 299. *Commonwealth* v. *McCan*, 277 Mass. 199, 203. *State* v. *Schutte*, 87 N. J. L. 15, affirmed 88 N. J. L. 396. *Brimhall* v. *State*, 31 Ariz. 522; 53 Am. L. R. 231. *Woodward* v. *State*, 164 Miss. 468. *Davis* v. *Commonwealth*, 150 Va. 611. And since manslaughter is simply a battery that causes death (*Minasian* v. *Aetna Life Ins. Co.* 295 Mass. 1, 5; *Commonwealth* v. *Velleco*, 272 Mass. 94, 99), if death results he is guilty of manslaughter. *Commonwealth* v. *Hartwell*, 128 Mass. 415, 417. *Commonwealth* v. *Pierce*, 138 Mass. 165. *Commonwealth* v. *Hawkins*, 157 Mass. 551, 553. *Commonwealth* v. *Parsons*, 195 Mass. 560, 569. *Commonwealth* v. *Peach*, 239 Mass. 575. *Commonwealth* v. *Guillemette*, 243 Mass. 346. *Commonwealth* v. *Arone*, 265 Mass. 128. *Commonwealth* v. *Jones*, 288 Mass. 150, 152. *Minasian* v. *Aetna Life Ins. Co.* 295 Mass. 1, 5. *Commonwealth* v. *Maguire*, 313 Mass. 669.

To convict the defendant of manslaughter, the Commonwealth was not required to prove that he caused the fire by some wanton or reckless conduct. Fire in a place of public resort is an ever present danger. It was enough to prove that death resulted from his wanton or reckless disregard of the safety of patrons in the event of fire from any cause.

III. *The alleged errors at the trial.*

1. There is nothing in the contention that the judge should not have ordered a view of the burned premises, and

should not have admitted photographs taken after the fire. True, the fire changed the appearance of the place, and the defendant suggests that acts of individuals after the fire also made some changes. But the walls, most of the partitions, and even some of the furniture, remained. The view enabled the jury to understand the evidence. The photographs were of value as evidence. Any material changes from conditions before the fire could have been shown by evidence.

2. The Commonwealth had the burden of showing that the alleged wanton or reckless failure to care for the safety of patrons was that of the defendant rather than that of some other officer or employee to whom the duty had been entrusted. Criminal responsibility is generally personal, and personal fault must be shown. *Commonwealth* v. *Stevens,* 153 Mass. 421. *Commonwealth* v. *Anthony,* 306 Mass. 470, 478. *Commonwealth* v. *Beal,* 314 Mass. 210, 222. *Braga* v. *Braga,* 314 Mass. 666, 672. Until the defendant testified at a late stage of the case, he admitted nothing, and excepted to the introduction of almost every piece of evidence tending to show his control of the corporation or of its premises. The Commonwealth was entitled to introduce in detail facts showing such control. One such fact was that he frequently gave orders to the clerk of the corporation to make and attest records and returns of imaginary meetings and votes. The defendant excepted to the admission of each piece of evidence, but did not take the course, which would have made all such evidence immaterial and unnecessary, of admitting complete control, until he did so in his later testimony. He now complains that the jury were given an unfavorable impression of his character and conduct in matters not relevant to any wanton or reckless conduct. But if he has been prejudiced thereby, he should blame his own insistence upon trying the case "closely," as the phrase is, with respect to a point that later he had to admit.

3. There is nothing in the point that because the corporation might have been indicted and convicted, the defendant could not be. The defendant was in full control of the

corporation, its officers and employees, its business and its premises. He could not escape criminal responsibility by using a corporate form.

4. The Commonwealth was properly allowed to show that an exit from the Cocktail Lounge to Shawmut Street and fire doors in the Cocktail Lounge and between that and the older part of the premises, called for by the plans that were approved by the building department of the city of Boston under St. 1907, c. 550, § 12, as amended, had not been provided when the defendant last had knowledge of the premises on November 16, 1942, although he planned to open the Cocktail Lounge the next day; that the mode of construction of the Cocktail Lounge indicated that he did not intend to provide either; and that they had not been provided at the time of the fire. As planned, the fire doors were to be held open by fusible plugs that would melt and allow the doors to close automatically in case of fire. They and the exit might have afforded some protection to persons in the Cocktail Lounge. The violation of such a statute is not negligence per se, but sometimes is evidence of negligence. *Richmond* v. *Warren Institution for Savings,* 307 Mass. 483. *Kelly* v. *Hathaway Bakeries, Inc.* 312 Mass. 297, 299. *Greenway Wood Heel Co. Inc.* v. *John Shea Co.* 313 Mass. 177. *Carroll* v. *Hemenway,* 315 Mass. 45, 46–47. Standing by itself, it would not warrant a finding of wanton or reckless conduct. *Silver's Case,* 260 Mass. 222, 224. *Commonwealth* v. *Arone,* 265 Mass. 128, 131. *Carroll* v. *Hemenway,* 315 Mass. 45. *People* v. *Lynn,* 385 Ill. 165. Am. Law Inst. Restatement: Torts, § 500, comment e. But it might be considered with other evidence. There was no error in its admission. *Commonwealth* v. *Hawkins,* 157 Mass. 551, 553, 554. *Isaacson* v. *Boston, Worcester & New York Street Railway,* 278 Mass. 378, 390.

5. The Commonwealth introduced evidence that the electrical system was defective and dangerous. Shortly after the fire started the electric lights went out, leaving the patrons struggling in the dark. What caused the lights to go out, did not appear. There was no evidence that the defendant knew, or had reason to know, of any defect in the

electrical system.   There was no evidence that faulty wiring caused the fire, or bore any causal relation to the deaths. A verdict of guilty could not lawfully have been based upon any such defect.   But when the evidence was introduced the judge could not foresee that knowledge on the part of the defendant and some causal relation would not be shown. He had a right to let the Commonwealth begin by proving defective wiring.   If the defendant had a remedy, it was by asking the judge to strike out the evidence when it appeared that no causal relation existed and the defendant was not shown to be responsible for any such defect, or by asking the judge to instruct the jury that a verdict of guilty could not be based upon wanton or reckless conduct with respect to the electrical system.   No such request was made.

6. Other assignments of error, relied on by the defendant but not discussed in this opinion, have not been overlooked. We find nothing in them that requires discussion.

*Judgments affirmed.*