SUPERIOR COURT 
 
 COMMONWEALTH vs. TANIA BOGHOSSIAN

 
 Docket:
 18-606
 
 
 Dates:
 October 8, 2019
 
 
 Present:
 Peter B. Krupp Justice of the Superior Court
 
 
 County:
 MIDDLESEX, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS
 
 

 

            Defendant Tania Boghossian is charged with armed assault
to murder a person 60 years or older (Count 001), suffocation (Count 002),
assault and battery on an elder (Count 003), and abuse, neglect or mistreatment
of a person 60 years or older for whom she was a caretaker (Count 004).
Defendant's father, Antoine Boghossian, is the named victim in each charge.
While Counts 001 - 003 arise out of a single incident on October 12, 2018,
Count 004 broadly sweeps up almost six years of interactions between defendant
and her father. Specifically, Count 004 alleges a violation of G.L. c. 265, §
13K(d1/2), "[o]n diverse dates" between November 1, 2012 and October
12, 2018. Defendant moves to dismiss Count 004. She argues under Commonwealth
v. McCarthy, 385 Mass. 160 (1982), that the grand jury heard insufficient
evidence to support that indictment, particularly after the Supreme Judicial
Court's interpretation of "wanton or reckless" conduct in
Commonwealth v. Hardy, 482 Mass. 416 (2019). For the following reasons, the
motion must be denied.

BACKGROUND

            The grand jury had the following information, and could
have reasonably inferred from the information before it, the following:

                                                            -1-

            A.        The
Precipitating Incident (Counts 001 — 003) 

            On October 12, 2018, Mr. Boghossian, who was 86 years
old, was a patient at Mt. Auburn Hospital, and had been a patient there for a
week with a diagnosis of "vascular dementia with behavioral
disturbances." The hospital discussed with defendant hospice options for
Mr. Boghossian and recommended a skilled nursing facility for him. The hospital
noted that although Mr. Boghossian was only supposed to be on one medication,
defendant had been giving him two different medications.

            Because of his seizure activity, perhaps among other
reasons, the hospital assigned a one-to-one sitter to stay with Mr. Boghossian
at the hospital and to call in a nurse if needed. During Mr. Boghossian's
hospitalization, defendant frequently stayed in his room. The one-to-one sitter
noticed Mr. Boghossian would be slightly more agitated when defendant was in
the room than when she was not.

            On October 12, 2018, when the one-to-one sitter stepped
behind a curtain to let defendant have a private moment with Mr. Boghossian,
the one-to-one sitter heard rustling, heard defendant say we are going to stop
breathing now, and then observed defendant holding a pillow over her father's
face and pinning the pillow down with her forearms. The sitter quickly
intervened. Ultimately, defendant tried to run away, sprinting into a stairwell
and running down to the lobby before being stopped by security. These alleged
facts give rise to Counts 001, 002 and 003.

            B.        Earlier
Events (Count 004)

            Count 004 arises from involvement by Springwell
Protective Services ("Springwell") with defendant and her father over
the six years before October 12, 2018. Springwell, among

                                                            -2-

other things, investigates
suspected elder abuse and neglect and provides services to elders in the
community.

            Mr. Boghossian was diagnosed with dementia in or before
2012.[1] From 2012 on, defendant handled her father's finances and medical
appointments, sometimes with the assistance of an aide, who was a family friend
and who at various times lived in the Boghossian home.[2] As discussed below,
Springwell first became involved with defendant and her father in or about
November 2012.

                        1.         2012
- 2013

            In November 2012, Mr. Boghossian was in a car accident,
but kept driving and did not remember he had been in the accident. Mr.
Boghossian was hospitalized after the accident and later was placed in a
skilled rehabilitation facility. (The Commonwealth made clear at argument that
it does not contend that defendant violated § 13K(d1/2) by permitting Mr.
Boghossian to drive in connection with the November 2012 car accident.) On
December 26, 2012, Mr. Boghossian had a stroke and became even more confused.
Springwell personnel spoke to defendant about Mr. Boghossian not being left
alone given his cognitive and physical status. Defendant expressed feeling
overwhelmed. From January through July 2013, Mr. Boghossian

---------------------------

[1]According
to the Mayo Clinic, "dementia" is not a specific disease, but is
"a group of symptoms affecting memory, thinking and social abilities
severely enough to interfere with [a person's] daily life" that may be
caused by "several different diseases." Symptoms of dementia include
cognitive changes, such as memory loss, confusion, and difficulty
communicating, accessing words, reasoning, handling complex tasks, and
planning; and psychological changes, including personality changes, depression,
anxiety, inappropriate behavior, paranoia, agitation and hallucinations. See
Dementia, Symptoms & Causes, available at
https://www.mayoclinic.org/diseases-conditions/dementia/symptoms-causes/syc-20352013
(last viewed Oct. 4, 2019). No scientific or medical evidence was presented to
the grand jury about Mr. Boghossian's dementia other than limited medical
records.

[2]At
various times between 2012 and 2017, Mr. Boghossian's ex-wife and defendant's
mother would visit and sometimes stay at the home for medical reasons.

                                                            -3-

was in a skilled facility. At
the end of this period, defendant reported that she had hired someone to
provide 24/7 care and Springwell's involvement ended.

            No evidence of any events or conduct violative of §
13K(d1/2) was presented to the grand jury related to the period between Mr.
Boghossian's car accident in November 2012 and events beginning in August
2015.[3]

                        2.         2015

            Springwell became involved again in August 2015 when it
received information that Mr. Boghossian had dementia and was wandering, but
would usually find his way home. It received information that on one occasion
in August 2015, Mr. Boghossian "wandered into traffic and caused an
accident." Defendant refused to obtain adult daycare or private care for
her father.

            Springwell also received reports that defendant would
often drop off Mr. Boghossian at the Belmont Public Library ("BPL")
and he would be at the BPL 5-7 times per week. BPL staff reported concerns
about Mr. Boghossian being confused. They reported that he acted as if he were
home, appeared very agitated at times, and in one instance took off his pants
and folded his clothes as if he was trying to go to sleep. The librarian would
call defendant, but she would often refuse to come and pick up Mr. Boghossian.
The Belmont police were called many times.

            Springwell personnel contacted Mr. Boghossian's primary
care physician in 2015, who reported that defendant was difficult to deal with
and did not follow his instructions for her father's care, including giving Mr.
Boghossian medication that was not then-prescribed, in contravention of medical
direction. Mr. Boghossian's primary care physician told Springwell

---------------------------

[3]Given
the Commonwealth's concessions and limited evidence before the grand jury about
events before August 2015, the "diverse dates" range dating back to
November 1, 2012 is substantially over-inclusive.

                                                            -4-

that he had recommended to
defendant that Mr. Boghossian needed 24-hour care at home or placement in a
long-term care facility.

            During Springwell's involvement in 2015, Mr. Boghossian
was hospitalized in a geriatric psychiatric unit. A psychiatrist who treated
Mr. Boghossian diagnosed him with "advanced dementia" and recommended
a skilled nursing facility. The psychiatrist reported that defendant
"provides insufficient supervision" of Mr. Boghossian, "which
places [him] at high risk of harm." Ultimately, defendant agreed to send
Mr. Boghossian to an adult day care several days per week and he was discharged
from the psychiatric unit in November 2015, but after a few weeks he stopped
going to the adult day care. Springwell ended this phase of its involvement
with Mr. Boghossian in February 2016 because, for months after his discharge,
Mr. Boghossian was no longer seen wandering in the community.

                        3.         2017

            On March 20, 2017, defendant called the Belmont Police at
7:17 PM to report that her father was missing and that she had not seen him
since 9 AM that day. The Arlington Police later found him and took him to Mt.
Auburn Hospital.

            Five days later, on March 25, 2017, Springwell received a
report from an overnight caregiver who had been with Mr. Boghossian at home for
about five days, but was quitting. She reported that she had been hired
privately by the family, but she did not feel comfortable with the
circumstances in the household. She described defendant as mentally ill and
expressed concerns that defendant was not adequately feeding her father, was
inappropriately overmedicating him, was permitting him to wander, and was not
getting adequate help for him. When this was reported to the Belmont Police,
the Belmont Police spoke with Mr. Boghossian, who reported that he was not
hungry and that his daughter provides good care for him. Thereafter, the

                                                            -5-

Belmont Police responded to a
considerable number of calls related to Mr. Boghossian wandering.[4] Springwell
offered various adaptive devices and methods to prevent Mr. Boghossian from
wandering, but defendant was unwilling to adopt them. At one point during
Springwell's investigation in this timeframe, Mr. Boghossian left the home and
went to the local police station, reporting that he was hungry and looking for
food. Defendant was unresponsive to Springwell's efforts and she declined
services from Springwell.

DISCUSSION

            The issue before me is narrow. Under McCarthy, the Court
must focus on the elements of the challenged indictment and evaluate the
information presented to the grand jury to determine if it supports a finding
of probable cause to believe the defendant committed the charged crime.
McCarthy, 385 Mass. at 163. "Probable cause . . . is a decidedly low
standard." Commonwealth v. Barbosa, 477 Mass. 658, 675 (2017), quoting
Commonwealth v. Hanright,

---------------------------

[4]On
April 11, 2017 at 11:16 AM, the police responded to a call about an elder
wandering. They found Mr. Boghossian walking down the street in his pajamas. He
reported that he had left his house ten minutes before, no one was at home with
him, and he wanted to find food because he was hungry. On Sunday, April 19,
2017 at 11 AM, the police received a call for a pedestrian wandering. They
found Mr. Boghossian again in his pajamas. He was unshaven and disheveled.
Although he knew his address, he appeared to lack memory. He said he was going
to the bank, but it was Sunday and the bank was closed. When the police spoke
with defendant, she acknowledged that she was Mr. Boghossian's caregiver, but
said she did not know that he had left. On July 9, 2017 at 7:58 AM, a police
officer responded to the residence where Mr. Boghossian and defendant lived and
found the doors locked "from the inside out." The police entered the
home through the basement and found Mr. Boghossian in his bed. Defendant seemed
worried and said she did not have the keys to unlock the doors in the house. On
July 10, 2017 at 6:15 PM, Mr. Boghossian waived down a police cruiser and
indicated he was locked out of his house, but seemed to be unable to answer any
questions, including about who his daughter was. Defendant was ultimately
located and said she had just left the house for an hour. On July 13, 2017, the
police found Mr. Boghossian "miles away from his home." When the
police could not reach defendant, they took Mr. Boghossian to the hospital. On
July 30, 2017, Mr. Boghossian went to the Belmont police station at 12:25 PM
and told the police he was hungry and had not yet had breakfast. When the
police were unable to reach defendant by phone, they went to the house and
found defendant asleep.

                                                            -6-

466 Mass. 303, 311(2013). It
is "reasonably trustworthy information. .. sufficient to warrant a prudent
[person] in believing that the defendant had committed or was committing an
offense." Hanright, 466 Mass. at 311-312, quoting Commonwealth v. Stevens,
362 Mass. 24, 26 (1972). Hearsay may be presented to the grand jury and may
form the basis for an indictment. Commonwealth v. Rakes, 487 Mass. 22, 29-30
(2017); Commonwealth v. Stevenson, 474 Mass. 372, 376 (2016).

            Analysis begins with the elements of the charged statute.
The applicable statute states in relevant part: "[w]hoever, being a
caretaker of an elder. . . , wantonly or recklessly commits or permits another
to commit abuse, neglect or mistreatment upon such elder. . . shall be punished."
G.L. c. 265, § 13K(d1/2). In this case, to prove a violation of § 13K(d1/2),
the Commonwealth must prove the following four elements: "(1) the
defendant was a caretaker, (2) of an elder. . . , and [s]he (3) wantonly or
recklessly (4) . .. committed. . . abuse, neglect, or mistreatment upon such
person." Commonwealth v. Cruz, 88 Mass. App. Ct. 206, 208-209 (2015). For
present purposes, we can dispense with certain elements at the outset: during
the relevant period, Mr. Boghossian was "an elder";[5] defendant does
not dispute that she was her father's "caretaker";[6] and the
Commonwealth does not contend there was "abuse." Therefore, the
relevant question is what the statute means by "wantonly or recklessly
commits or permits another to commit. . . neglect or mistreatment." G.L.
c. 265, § 13K(d).

---------------------------

[5]An
"elder" is "a person sixty years of age or older." G.L. c.
265, § 13K(a). Mr. Boghossian was in his eighties.

[6]A
"caretaker" is "a person with responsibility for the care of an
elder" "if a reasonable person would believe that such person's
failure to fulfill such responsibility would adversely affect the physical
health of such elder." G.L. c. 265, § 13K(a).

                                                            -7-

            Section 13K defines "neglect" as "the
failure to provide treatment or services necessary to maintain health and
safety and which either harms or creates a substantial likelihood of
harm." G.L. c. 265, § 13K(a). It defines "mistreatment" as
"the use of medications or treatments . . . which harms or creates a
substantial likelihood of harm." Id. There was no evidence presented to
the grand jury that any action or omission by defendant actually physically
harmed Mr. Boghossian. Therefore, the question is whether "the use of
medications or treatments" or "the failure to provide treatment or
services necessary to maintain health and safety" created "a
substantial likelihood of harm." G.L. c. 265, § 13K(d1/2). Under these
definitions of "mistreatment" and "neglect," the mere fact
that there is some risk that harm may result is not enough. To offend the
statute, the risk that harm may result due to a caretaker's actions or
omissions must be "a substantial likelihood."

            Although § 13K quantifies the chance that
"harm" will occur, i.e. "a substantial likelihood," it does
not define the term "harm." It does not attempt to quantify or
describe the severity of the possible harm necessary for the defendant's
actions or omissions to violate the statute.[7] Would a substantial likelihood
of the elder being confused and emotionally traumatized be sufficient? Would an
almost certain chance that the elder would get a paper cut with some minimal
risk of infection meet the statute? A skinned knee? A twisted ankle?

            Although § 13K(d1/2) does not define "harm," it
does define the phrase "bodily injury" to mean a "substantial
impairment of the physical condition."[8] Given the existence of the two

---------------------------

[7]Compare,
e.g., G.L. c. 265, § 13J (making it a crime to "wantonly or
recklessly" permit "bodily injury" to a child); G.L. c. 265, §
13L (making it a crime to "wantonly or recklessly engage[ ] in conduct
that creates a substantial risk of serious bodily injury or sexual abuse to a
child").

[8]The
full definition of "bodily injury" is "substantial impairment of
the physical condition, including, but not limited to, any burn, fracture of
any bone, subdural hematoma, injury to any internal organ, or any injury which
occurs as the result of repeated harm to any bodily function or organ,
including human skin." G.L. c. 265, § 13K(a). The statute also defines
"serious bodily injury" as "bodily injury which results in
permanent disfigurement, protracted loss or impairment of a bodily function,
limb or organ, or substantial risk of death." Id.

                                                            -8-

different phrases in the same
statute, the Appeals Court wrote in an unpublished opinion involving alleged
"abuse" under § 13K(d1/2), that the term "harm' caused by
'abuse' is something other than 'substantial impairment of the physical
condition." [9] Commonwealth v. Shartrand, 2017 WL 3526329 at *2 (Mass.
App. Ct. Aug. 17, 2017) (Rule 1:28 decision). The panel in Shartrand then
stated that the term "harm" in the definition of "abuse" in
§ 13K(a) broadly "includes, but is not limited to, death, physical injury,
pain or psychological injury" and that "[p]sychological injury
includes, but is not limited to, conduct which coerces or intimidates a patient
or resident, or which subjects that patient or resident to scorn, ridicule,
humiliation, or produces a noticeable level of mental or emotional
distress." Id., quoting 105 C.M.R. § 155.03 (2000). Without any
explanation, the Appeals Court panel imported into the criminal statute the
definition of "harm" used in the Department of Public Health
regulations for preventing abuse by licensed facilities and licensed home
health workers. Notably, the court in Shartrand did not address how its
definition of "harm" interacted with the notion of wanton or reckless
conduct.

            Given the facts of this case, it is highly relevant that
the "neglect or mistreatment" must be committed "wantonly or
recklessly." To prove "wanton or reckless" conduct, the
prosecutor may not aggregate individual negligent acts to paint a picture of
inattention or generally poor care giving, Commonwealth v. Life Care Ctrs. of
Am., Inc., 456 Mass. 826, 832-834 (2010), nor

---------------------------

[9]In
Commonwealth v. Shartrand, the defendant was convicted of "abuse"
under § 13K(d1/2). In defining "abuse," the statute seems to use
"harm" the same way it is used in the definitions of
"neglect" and "mistreatment." See G.L. c. 265, § 13K(a)
("physical contact which either harms or creates a substantial likelihood
of harm").

                                                            -9-

does the statute impose
strict liability. Instead, the Commonwealth must produce evidence that a
particular act or series of acts was "wanton or reckless."

            In construing the "wanton or reckless" element
in § 13K(d1/2), the Appeals Court has used the common law notion of
"[w]anton or reckless conduct," describing it as "intentional
conduct, by way either of commission or of omission where there is a duty to
act, which conduct involves a high degree of likelihood that substantial harm
will result to another." Cruz, 88 Mass. App. Ct. at 209 (internal
quotations omitted). This definition, which traces back to Commonwealth v.
Welansky, 316 Mass. 383 (1944), allows for a criminal sanction where an
individual acts intentionally although an ordinary person under the
circumstances "would have realized the gravity of the danger." Id. at
398-399 (emphasis added). See also, e.g., Commonwealth v. Carrillo,            Mass.   ,2019 WL 4865700 at *1 (Oct. 3, 2019) (for involuntary
manslaughter "by wanton or reckless conduct" the Commonwealth must
prove defendant "engaged in conduct that creates 'a high degree of
likelihood that substantial harm will result to another"; distribution of
heroin to addict, without more, not "wanton or reckless"), quoting
Welansky, 316 Mass. at 399; Hardy, 482 Mass. at 421 (defining "wanton or
reckless" under common law in contrast to clear legislative intent in G.L.
c. 265, § 13L to depart from common law definition of "wanton or
reckless" and require proof of defendant's subjective knowledge of risk).

            But defendant is not facing a common law crime. The
question presented in construing § 13K(d1/2) is how the legislature intended
"wantonly or recklessly" to be used in the statute. There are three
possible alternatives: the phrase could be used to define (i) the degree of
risk; (ii) the nature or severity of the potential injury; and/or (iii) that
the defendant must act intentionally in disregard of the risk. In the common
law, "wanton or reckless" conduct includes all three

                                                            -10-

elements: it requires (i)
"a high degree of likelihood" (ii) of "substantial harm . . . to
another" and (iii) "intentional conduct" notwithstanding the
known risk. Welansky, 316 Mass. at 399.

            For a statutory crime, the phrase "wanton or
reckless" could vary, particularly if the phrase is defined or if
particular elements are clearly defined in the statute. For example, §
13K(d1/2) itself expressly defines the degree of risk, i.e. a "substantial
likelihood," that harm will result. The notion of "wanton or
reckless" seemingly adds nothing to this "substantial
likelihood" formulation. In contrast, § 13K(d1/2) does not define the term
"harm," but uses other terms, including "bodily injury" and
"serious bodily injury," which seemingly are more serious than the
broader, more generic term "harm." In this context, does "wanton
or reckless" serve to define the nature or severity of the potential
injury? If Shartrand is correct, the "harm" about which § 13K(d1/2)
is concerned could be minimal. It could be any "pain" or
"physical injury," or even a "psychological injury,"
including "scorn, ridicule, [or] humiliation." Can a person violate §
13K(d1/2) by intentionally acting in disregard of a known (or reasonably
knowable) risk that was substantially likely to produce a minimal harm? This
seems to be the import of the nonbinding decision in Shartrand, although it
would stand the traditional notion of wanton or reckless conduct — action in
disregard of the gravity of the danger — on its head.

            To decide the motion before me, I need not resolve the
question of whether Shartrand  correctly
defines "harm" because the Commonwealth concedes that the
"longstanding" notion of "wanton or reckless conduct"
applies. See Commonwealth's Motion in Opposition to the Defendant's Motion to
Dismiss Indictment at 7, quoting Cruz, 88 Mass. App. Ct. at 209. Assuming the
Commonwealth must prove defendant acted despite a "substantial
likelihood" that "substantial harm will result to another," the
Commonwealth has brought forward sufficient

                                                            -11-

evidence to establish
probable cause.[10] The grand jury could fairly have concluded from the
evidence that defendant was her father's caregiver throughout the relevant
period; she was overwhelmed; she mis-medicated her father intentionally; she
failed to put safeguards in place to prevent her father from wandering and to
provide him with appropriate and necessary supervision despite numerous events
that put her on notice of the substantial risk he was in; and that on at least
one occasion he wandered into traffic and caused an accident. While there are a
variety of questions about whether the Commonwealth will ultimately be able to
prove its case, [11] reasonable inferences to be drawn from the evidence before
the grand jury would permit a finding of probable cause to believe defendant
had violated § 13K(d1/2).

            Defendant also argues that the hearsay presented to the
grand jury was unreliable and is not sufficient to support the indictment. I
disagree. Having read the grand jury testimony and exhibits, I find that many
of the hearsay statements are independently reliable or corroborate others (e.g.
information from the police corroborates information from librarians; medical
records and information from mandated reporters corroborate information from
one another and from health care providers). In short, the hearsay statements
are sufficiently reliable to support the indictment.

---------------------------

[10]In
Carrillo, the Supreme Judicial Court explored the distinction between the
probable cause standard and questions about the sufficiency of the evidence at
trial. See 2019 WL 4865700 at **5-6. Whether the Commonwealth will be able to
prove a violation of § 13K(d1/2) beyond a reasonable doubt at trial is not
before me.

[11]What
did defendant do or know on each particular instance? What were the traffic
patterns in the area or the neighborhood? What medications were improperly
provided, at what dosages, and over what period?

                                                            -12-

ORDER

            Defendant's Motion to Dismiss Certain Indictments Under
Commonwealth v. McCarthy for Lack of Probable Cause to Indict (Docket #15) is
DENIED.

@/s/Peter B. Krupp Justice of
the Superior Court

@October 8, 2019

                                                            -13-

xxz