COMMONWEALTH *vs.* RALPH J. SULLIVAN.

Middlesex. December 7, 2001. - May 15, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Severance, Trial of indictments together, Admissions, and confessions, Instructions to jury, Capital case. *Identification. Evidence,* Identification. *Constitutional Law,* Admissions and confessions.

At the trial of indictments for murder, armed robbery, and several lesser offenses arising from three episodes in the course of one month, the judge did not abuse his discretion in permitting joinder of the three episodes in one trial pursuant to Mass. R. Crim. P. 9, where the three episodes were sufficiently connected together, and where the defendant failed to show that he was prejudiced by the joinder. [802-806]

At a criminal trial, the judge erred in excluding a tape recording of a telephone message suggesting that someone other than the defendant admitted to committing the crime; however, the judge's failure to admit the tape recording did not prejudice the defendant, where the Commonwealth's evidence as to the defendant's committing the crime was very strong. [806-808]

At a criminal trial, there was no error in the judge's admitting in evidence testimony regarding an accomplice's admission to another and the defendant's response, and the defendant's trial counsel was not ineffective for failing to move to strike the testimony. [808-809]

At the trial of indictments for murder, armed robbery, and several lesser offenses, the judge did not err in admitting testimony that the defendant had said he liked to rob jewelry stores, where the statement was admissible, not as evidence of the defendant's propensity to commit crime, but as evidence of his intent to commit a robbery at the time he shot the victim; further, in the circumstances, the absence of a limiting instruction did not create a substantial likelihood of a miscarriage of justice. [809]

INDICTMENTS found and returned in the Superior Court Department on August 4, 1994, and March 10, 1995.

The cases were tried before *Robert A. Barton,* J.

*Wendy H. Sibbison* for the defendant.

*Eric R. Barber-Mingo,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. Ralph J. Sullivan appeals from his convictions of

felony-murder, armed robbery, and several lesser offenses, arising out of three episodes in 1994: an armed robbery at A&K Jewelers in Stoneham on June 16; a fatal shooting at Ware Jewelers in Waltham on July 5; and a burglary of BJ's Wholesale Club in Medford on July 14.[1] He asserts numerous errors, including a claim that these indictments should not have been tried together. We affirm the judgments, and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* We recite the facts as the jury could have found them, reserving certain details for discussion in conjunction with the issues raised.

a. *A&K Jewelers.* At about 6:30 P.M. on June 16, 1994, Marilyn Dillon, an employee of A&K Jewelers, "buzzed" the defendant and Anthony Miller into the shop. Both wore baseball caps, sunglasses, and surgical gloves. The defendant pulled out a gun, then proceeded to a back room where the owner and another employee were working and ordered them to the floor. He instructed Miller to "go for the diamonds." After Dillon unlocked the display cases, Miller filled a large green trash bag with jewelry. The defendant took the owner's wallet and yelled, "Let's get out of here." As they fled, the owner fired several shots at them with his own gun; he did not hit anyone, but shattered the front windows. The robbers escaped into a waiting, stolen Chevrolet Blazer vehicle with an accomplice at the wheel.

Later that night, the defendant and Miller carried a duffel bag into the kitchen of a pizza shop, and offered to sell some rings to "Mike the Greek" for $10,000. They also went to visit Miller's brother-in-law, Charles Lesage. Miller gave Lesage two rings identified as having been stolen from A&K Jewelers that night and several hundred dollars in cash. On June 17, the day after the robbery, the defendant paid $2,500 in cash for a used white Volvo automobile. On June 18, he gave Stephanie Zero a stolen A&K ring and $100 from a large wad of bills, and then took her shopping, spending $200 more on items for their son.

The defendant told Christina Fernandes that the reason she had not seen him for one week or so in middle to late June was

---

[1]Two convictions relating to the BJ's Wholesale Club burglary were filed with the defendant's consent and are not a part of the appeal. See *Commonwealth* v. *Thompson*, 431 Mass. 108, 109 n.1 (2000).

that he had been "hiding out in New Hampshire because of a big shootout." He also asked her to hide his gun for him for a few days. From a photographic array of people wearing hats and sunglasses, the owner of A&K Jewelers tentatively identified the defendant on July 14 or 15; saying, "That looks like the robber, but I'm not certain."

b. *Ware Jewelers.* Less than two weeks after the A&K incident, the defendant asked to borrow Fernandes's car, telling her that his white Volvo "stood out too much" and he "had something staked out." On June 30, the defendant, Miller, and Lesage stole a blue Buick automobile to "save it for a score."

Later that day, the defendant and Miller took Linda Carney in the defendant's Volvo to the lot where they had left the stolen Buick. The defendant, who was wearing black leather gloves, gave Carney a pair of surgical gloves. Carney testified that he told her to drive him in the blue car while Miller waited in the Volvo. She drove a short distance and then stopped, saying she "wasn't going to do this." All three began to argue. Carney got out and walked back to the Volvo. Miller took her place in the driver's seat. Carney testified that as they were driving off, she heard Miller tell the defendant, "All you have to do is flash it." Nothing further appears in the record regarding whether a robbery took place that day.

On July 5, the defendant and Miller entered Ware Jewelers. Miller stayed in the front of the store where G. Richard Ware had been working. The defendant went to the back office, gun in hand. Mark Mariani was in that office watching the defendant's armed approach on the security camera. The defendant said Mariani "was going for a gun, so [he] smoked him." The defendant and Miller fled. Ware fired at them in vain as they climbed into a getaway car identified as the stolen blue Buick.

That evening the defendant and Miller visited Lesage. Both men seemed nervous. Miller took Lesage aside and said, "[I] think [we] shot someone, someone got shot." The defendant, who had been standing nearby, interjected, "What are you tell-

ing him for? Be quiet."[2] The defendant also expressed particular interest in the news report of the shooting, asking what had happened, whether police had a description of the car, and whether anybody had died. He offered that he did not think it had been a robbery: "It might have been a hit or something, [because no one] would just go in and rob a store and not take anything."

Michael Crippa testified that the defendant had told him about the attempted robbery and shooting when they were cellmates in March of 1996. Crippa reported that the defendant said, "I like to rob jewelry stores; that's what I do." The defendant also told Crippa that he had shot someone during a robbery attempt because the man had resisted instead of giving him the jewelry. The defendant said he was hoping to use as a defense that someone else had done it, because in all of his other jewelry store robberies he had taken something, but nothing had been taken this time. He also told Crippa that he had a private investigator who found out that the wife of the victim had been having an affair, "and they were going to make it out like he [the wife's lover] was the man who had committed the murder."

c. *BJ's Wholesale Club.* Nine days after the shooting at Ware Jewelers, on July 14 at 12:30 A.M., the defendant and Miller pried open the front fire door at BJ's Wholesale Club (BJ's) in Medford. Inside, a security camera videotaped the defendant jumping over the jewelry case and breaking the glass. Ten minutes later, a Medford police officer stopped the defendant's Volvo 150 yards from BJ's. The defendant, Miller, and a woman who had waited in the car while the men committed the burglary were in the front seat with the stolen jewelry; two computers, also taken from BJ's, were on the back seat. Also in the car were the tools used for the BJ's break-in, a box of green trash bags like the one used in the A&K Jewelers robbery, and a notebook that came from the blue Buick used in the Ware Jewelers incident.

2. *Joinder.* The defendant claims that the judge erred in permitting the larceny at BJ's to be tried together with the other two incidents, and that joinder of these three incidents in one trial was prejudicial to him. Joinder is governed by Mass R.

---

[2]The statement may have been "Why are you telling him that?" or "What are you doing? What are you saying?" See Part 4, *infra.*

Crim. P. 9, 378 Mass. 859 (1979),[3] which provides that the trial judge shall join related offenses for trial unless joinder is not in the best interests of justice. See Mass R. Crim. P. 9 (a) (3). Thus, joinder requires first that the offenses are related, and second that joinder be in the best interests of justice. See Reporters' Notes to Mass. R. Crim. P. 9, Mass. Ann. Laws 83-84 (Lexis 1997). The propriety of joinder is a matter for the trial judge's discretion. See *Commonwealth* v. *Wilson,* 427 Mass. 336, 345 (1998), and cases cited.

a. *"Related" offenses.* While "the goal of judicial economy will rarely be paramount to affording the defendant a trial as free from prejudice as possible," *id.* at 81, where offenses are related, there is "little danger" of such prejudice. *Commonwealth* v. *Hoppin,* 387 Mass. 25, 33 (1982). In *Commonwealth* v. *Blow,* 362 Mass. 196, 200 (1972), we explained that joinder is permitted where "the separate offences would be proved by 'evidence connected with a single line of conduct, and grow out of what is essentially one transaction.' " *Id.,* quoting *Commonwealth* v. *Maloney,* 348 Mass. 610, 614 (1965). The defendant relies on *Blow,* pointing to the facts in that case to argue that our holding there is dispositive of joinder here. In that case, the defendant was charged with robbery of one individual, and breaking and entering and larceny from two more; all of these events occurred on the same day, November 7, 1969. Joinder was not proper, we said, because the "diverse criminal activity" that occurred on that date was not the result of a "single line of conduct" growing out of "one transaction," and that severance should have been granted. *Id.* at 200-201.

The defendant argues that this case, like *Blow,* also involves robbery and burglary of several targets, and that the "evidence reveals no relationship" between the crimes. *Id.* at 200. The

[3]Rule 9 (a) provides, in pertinent part:

"(1) Related Offenses. Two or more offenses are related offenses if they are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan. . . .

"(3) Joinder of Related Offenses for Trial. If a defendant is charged with two or more related offenses, either party may move for joinder of such charges. The trial judge shall join the charges for trial unless he determines that joinder is not in the best interests of justice."

defendant's reliance on *Blow* is misplaced because that case was decided before our rules of criminal procedure were adopted. When *Blow* was decided in 1972, joinder was governed by G. L. c. 277, § 46 (repealed by St. 1979, c. 344, § 37), which stated: "Two or more counts describing different crimes depending upon the *same facts or transactions* may be set forth in the same indictment if it contains an averment that the different counts therein are different descriptions of the *same acts*" (emphasis added). In contrast, Mass. R. Crim. P. 9 (a) (1), which now governs joinder, states that offenses are "related" if they "are [1] based on the same criminal conduct or episode or [2] arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." The criteria for joinder are now somewhat broader than when the *Blow* case was decided, as it is now expressly permissible to join offenses concerning separate episodes where they are "connected together or constitut[e] parts of a single scheme or plan."[4] See Reporters' Notes to Mass. R. Crim. P. 9, *supra* at 81-82.

The facts of this case demonstrate a series of criminal episodes that are sufficiently connected together or constitute parts of a single scheme or plan. In each episode, the defendant and Miller acted together. In each episode, they stole or intended to steal a retail store's jewelry in order to "fence" it for cash. In each episode, they left an accomplice outside with a getaway car. The episodes occurred in the same general geographic region (Stoneham, Waltham, and Medford), and in fairly close temporal proximity: no more than two weeks ever passed

---

[4]Because *Commonwealth* v. *Blow*, 362 Mass. 196 (1972), applied the standard set forth in the statute, which was more restrictive than the standard set forth in the rules, decisions subsequent to the adoption of the rules in 1979 that have cited the *Blow* case when upholding joinder are inapposite to the analysis here: because joinder was upheld in those cases under the stricter, statutorily defined standard, it would have been upheld under the broader, rules-based standard as well. It was therefore unnecessary in those cases to discuss the differences between the statute and the rule.

We have not previously focused on the difference between the former statute and the current rule. We do so here because it is apparent, even if we were to determine, as the defendant maintains, that joinder was improper under the *Blow* standard, that joinder was permissible under the prevailing rule.

between the planning or execution of each episode.[5] "Separate trials are not required merely because offenses occurred on different dates . . . or involved different victims" (citations omitted). *Commonwealth* v. *Auguste*, 414 Mass. 51, 60 (1992). There was no abuse of discretion in the judge's decision that the crimes were sufficiently related.

b. *"Best interests of justice."* Where offenses have been properly joined under rule 9 (a) (1), the burden is on the defendant to show that he nevertheless has been prejudiced by the joinder, and that severance should have been granted under Mass. R. Crim. P. 9 (d). See *Commonwealth* v. *Wilson, supra* at 346-347; Reporters' Notes to Mass. R. Crim. P. 9, *supra* at 84-85. See also *Commonwealth* v. *Green*, 52 Mass. App. Ct. 98, 102-103 (2001), citing *Unites States* v. *Lane*, 474 U.S. 438, 449 (1985) (misjoinder requires reversal only if defendant actually prejudiced).

The defendant has failed to carry his burden. The evidence of each episode was presented separately, and throughout the trial the judge carefully instructed the jurors to consider each episode separately. See *Commonwealth* v. *Wilson, supra* at 347 ("no indication in the record that this instruction was inadequate to offset any possible prejudice from the joinder, or that the jury inappropriately applied evidence of one indictment toward another"). The only evidence contributed from the BJ's

---

[5]Massachusetts Rule of Criminal Procedure 9, 378 Mass. 859 (1979), unlike its Federal counterpart, does not expressly authorize joinder where crimes are of "the same or similar character." Compare Fed. R. Crim. P. 8 and 13 (authorizing joinder where offenses "[1] *are of the same or similar character* or [2] are based on the same act or transaction or [3] on two or more acts or transactions connected together or constituting parts of a common scheme or plan"), with Mass. R. Crim. P. 9 (a) (1) (authorizing joinder where offenses "[1] are based on the same criminal conduct or episode or [2] arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan"). Thus mere similarity is not sufficient by itself to show relatedness. See *Commonwealth* v. *Sylvester*, 388 Mass. 749, 754-755 (1983). But see *Commonwealth* v. *Ferraro*, 424 Mass. 87, 91 (1997) (concluding that similarity of attacks makes them related offenses). However, similarities between episodes is a factor that may be considered. See *Commonwealth* v. *Feijoo*, 419 Mass. 486, 494-495 (1995) (single scheme where karate coach instructed students that they must overcome their deepest fear of "being gay" by engaging in sexual activity with him); *Commonwealth* v. *Mamay*, 407 Mass. 412, 416 (1990) (single scheme where doctor committed sexual crimes on female patients during office visits).

burglary to the A&K and Ware incidents consisted of the items found in the defendant's car at the BJ's arrest: the notebook (originating from the car stolen for the Ware shooting); large green trash bags (used in the A&K robbery); and black leather gloves (worn by the defendant in the "casing" incident that demonstrated his intent to rob at Ware). Had the A&K and Ware episodes been tried separately from the BJ's episode, these items from the BJ's case would have been admissible in the A&K and Ware trial to prove identity. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986). There is no prejudice to the defendant in having one jury hear this evidence.[6]

3. *Tape recording.* The defendant attempted to present evidence that the prosecution had charged the wrong man, suggesting that the shooting victim, Mark Mariani, in fact was killed by one Michael Sullo. Mariani was a married man who was having an affair with Sullo's former wife. Two days after Mariani was killed, the following message was left on the former wife's answering machine: "Yeah, you know, you're a real asshole, going out with a married man, fucking him over. You're next on the list." She immediately dialed 911 and told police officers that she thought the voice might have been Sullo's. As a result, the domestic violence unit installed a "panic button"[7] on her telephone. The defendant intended to argue that the words "you're next" implied that Mariani had been first; in other words, that Sullo in effect had admitted to the killing.

The former wife later disavowed her earlier statement made to the grand jury that the voice might have been her former husband's. During the voir dire at trial, she stated that the voice was "[a]bsolutely not" his. The judge refused to admit any testimony concerning her prior statement, and ruled that because there was no competent evidence identifying the voice as Sullo's, the tape was also inadmissible. Assuming, without deciding, that identification was a prerequisite to the tape's admissibility, the judge erred in excluding the recording. The tentative

---

[6]The defendant also claims that it was error to permit each episode to be used as evidence of motive and intent as to the others. This is a proper use of "bad acts" evidence. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986); Proposed Mass. R. Evid. 404 (b). There was no error.

[7]A device which, when activated, signals the police station of the need for help.

nature of an identification does not disqualify it from admission, but goes to its weight. See *Commonwealth* v. *Paszko*, 391 Mass. 164, 172 (1984). An extrajudicial identification may be offered as substantive evidence even when the witness repudiates that identification at trial as long as there is no dispute that the prior identification in fact was made. See, e.g., *Commonwealth* v. *Clements, ante* 190, 192-193 (2002); *Commonwealth* v. *Daye,* 393 Mass. 55, 61 & n.9 (1984), and cases cited; *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 408-409 (1978); Proposed Mass. R. Evid. 801 (d) (1) (C). Whether to credit the earlier statement or the one made on the stand is for the jury. See *Commonwealth* v. *Torres,* 367 Mass. 737, 739 (1975); *Commonwealth* v. *Clements,* 51 Mass. App. Ct. 508, 520-521 (2001), *S.C., ante* 190 (2002), quoting *DiCarlo* v. *United States,* 6 F.2d 364, 368 (2d Cir.) (Hand, J.), cert. denied, 268 U.S. 706 (1925). The prosecutor stipulated that the former wife had testified at the grand jury that the voice might have been her former husband's. Therefore, her grand jury statement would have been competent evidence at trial tentatively identifying the voice as Sullo's. It was for the jury to determine whether her statement constituted a credible identification, and whether it was more believable than her testimony on the stand.

Moreover, as the defendant argues, the recording was admissible regardless of whose voice it was simply because it suggests that someone — anyone — other than the defendant admitted to the killing, and provides a motive unrelated to the defendant. Had the jurors heard the tape, it would have been up to them to determine whether it truly indicated another person's confession to the murder or whether it was simply part of a cruel attempt to frighten the former wife, capitalizing on the tragic coincidence that her lover had just been murdered.

The judge's failure to admit the tape did not prejudice the defendant, however. The Commonwealth's evidence on the shooting was extremely strong: the defendant's admission to Crippa; the defendant's reaction when Miller told Lesage, "[I] think [we] shot someone"; the blue Buick stolen by the defendant "for a score"; the defendant's use of that same car to "case" another jewelry store a few days before the Ware incident; the identification of the Buick as the getaway vehicle

at Ware Jewelers; and the presence of the notebook from that car in the defendant's Volvo one week later. Given this very strong evidence, we decline to order a new trial.

4. *Statement by the defendant.* Next, the defendant claims it was error to admit testimony regarding Miller's admission to Lesage and the defendant's response, and that trial counsel was ineffective for failing to move to strike that testimony. There was no error.

Lesage testified that on the evening of July 5, 1994, Miller and the defendant arrived at his house looking "nervous and shaky." Miller pulled Lesage into the bathroom to talk, leaving the defendant in the hallway just outside the half-opened bathroom door. Lesage testified that Miller, without running the water or making any other effort to drown out the sounds of their voices, "said that they think they shot someone, that someone got shot." The defendant then came into the bathroom and spoke to Miller. On direct examination, Lesage testified that the defendant said, "What are you telling him for? Be quiet." On cross-examination, he stated that the defendant's words were, " 'Why are you telling him that?,' something like that." The prosecutor then produced the report Lesage had given to the police wherein he had said the defendant's words were, "What are you doing? What are you saying?," and the following exchange took place:

*Q.*: "Is that what [the defendant] said? 'What are you doing? What are you saying?' ''

*A.*: "Yeah."

*Q.*: "So when you told the jury on direct examination that he said something else, you weren't accurate, were you?"

*A.*: "He said that; yes, he did."

The defendant claims that by this colloquy, Lesage withdrew his initial characterization of the defendant's words, and that trial counsel was ineffective for failing to move to strike the "What are you telling him for? Be quiet," version. We disagree. The statement, "He said that; yes, he did," is ambiguous, with no clear referent for the word "that." Lesage acknowledged that

his testimony might not have been the defendant's words verbatim, characterizing them as "something like," "Why are you telling him that?" In light of Lesage's total testimony, it is clear that the import of the defendant's statement was to rebuke Miller for admitting that "they shot someone." This statement by the defendant, together with its context, was admissible; there was no error, and hence no ineffectiveness of counsel. See *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 505-508 (1992). See generally *Commonwealth* v. *Babbitt*, 430 Mass. 700, 704-708 (2000) (discussing admissions and adoptive admissions).

5. *Character evidence.* The defendant next claims it was error to admit Crippa's testimony that the defendant had said, "I like to rob jewelry stores; that's what I do." This statement is not admissible as evidence of the defendant's propensity to commit crime, see *Commonwealth* v. *Welcome*, 348 Mass. 68, 70-71 (1964), but it is admissible as evidence of the defendant's intent in the Ware incident. The propriety of the felony-murder charge rests on the jury's finding that the defendant was attempting to commit a robbery when he shot the victim; hence, the defendant's intent to rob the store was a material fact and evidence of this intent was admissible. See *Commonwealth* v. *Gollman*, *ante* 111, 114 (2002).

The jurors were given no instruction to limit their use of this evidence to its permitted purpose, and trial counsel did not request one. Although "[p]rompt cautionary instructions to the jury are critical to protecting a defendant against prejudice where such evidence is admitted," P.J. Liacos, Massachusetts Evidence § 4.4.6, at 157 (7th ed. 1999), there is no requirement that the judge give limiting instructions sua sponte, see *Commonwealth* v. *Leonardi*, 413 Mass. 757, 764 (1992). Nor does the lack of a limiting instruction necessarily create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Roberts*, 433 Mass. 45, 48, 61 (2000) (affirming conviction of murder in first degree where no limiting instruction given). The evidence of the first two incidents is very strong, see Parts 2 (b) and 3, *supra*, and the BJ's incident was captured on videotape. There is no substantial likelihood of a miscarriage of justice here.

6. *Remaining claims, cumulative error, and G. L. c. 278, § 33E.* The remaining claims (regarding closing argument, Crippa's letter, prior convictions, attempted escape, and failure to instruct) involved no abuse of discretion nor ineffective assistance of counsel. Elaboration would not contribute to our jurisprudence, and we do not discuss them further. See *Commonwealth* v. *Jervis*, 368 Mass. 638, 647 (1975). The errors that did occur in this case "had minimal impact, if any," and do not cumulate to require a new trial. *Commonwealth* v. *Duran*, 435 Mass. 97, 107 (2001). Finally, we have reviewed the entire record under our statutory obligation, and are not persuaded that anything in it requires us to disturb the jury's verdicts. See *id.* at 112.

*Judgments affirmed.*