## Commonwealth *vs*. Roland Walker.

No. 00-P-101.

Norfolk. October 11, 2002. - January 5, 2004.

Present: Perretta, Beck, & Rapoza, JJ.

Further appellate review granted, 441 Mass. 1103 (2004).

*Homicide. Wanton or Reckless Conduct. Evidence,* Reputation, Pattern of conduct, Relevancy and materiality. *Practice, Criminal,* Trial of indictments together, Verdict. *Words,* "Poison."

Evidence at the trial of an indictment charging manslaughter established that the defendant, by surreptitiously mixing his prescription sleeping medication with alcohol and serving the drink to another, demonstrated an indifference to and disregard of the high degree of likelihood that substantial harm would result. [260-264]

At the trial of indictments alleging that the defendant, on four different occasions, mingled poison with food, drink, or medicine, in violation of G. L. c. 265, § 28, the evidence provided a sufficient basis from which the jury could infer that the excessive dosage of the prescription sleeping medication administered by the defendant to one victim constituted a "poison" as that term is used in the statute; however, with regard to the other three victims, the evidence, which left unclear what effect the medication alone might have had on them, or whether the amount of medication found in their blood was of sufficient quantity to cause them injury or death, did not support a similar conclusion. [264-267]

This court declined to alter the settled law concerning the admission of character evidence by adopting Proposed Mass.R.Evid. 405(a), which would permit character witnesses to testify not only about a person's reputation in the community, but also about their own opinion of that person's character. [267-268]

At a criminal trial there was no abuse of discretion in the judge's decision that the crimes were sufficiently related to be tried together. [268]

This court concluded that prejudice, if any, arising from evidence properly admitted at a criminal trial to show a common scheme or pattern of conduct was sufficiently ameliorated by the judge's limiting instruction, given immediately after the admission of the evidence and repeated during the final instructions. [268-269]

A criminal defendant failed to demonstrate that his conviction for manslaughter was legally inconsistent with his conviction for mingling poison with food or drink with the intent to injure or kill, in violation of G. L. c. 265, § 28, where the conduct establishing a violation of § 28 was precisely the same conduct that constituted the act under the manslaughter charge that was done with disregard for the high degree of likelihood that substantial harm would result. [269-270]

INDICTMENTS found and returned in the Superior Court Department on April 16, 1997; February 25, 1998; and July 25, 1998.

A motion for joinder of indictments was heard by *H.J. Smith, Jr.,* J., and the cases were tried before *Julian T. Houston,* J.

*Charles W. Rankin* for the defendant.

*Varsha Kukafka,* Assistant District Attorney (*Jeanmarie Carroll,* Assistant District Attorney, with her) for the Commonwealth.

RAPOZA, J. In November, 1998, after a fourteen-day jury trial in the Superior Court, the defendant was convicted on eleven indictments alleging manslaughter, assault with intent to rape, drugging a person for sexual intercourse, four counts of assault and battery by means of a dangerous weapon, and four counts of mingling poison with food, drink, or medicine. The defendant was acquitted of one count of rape. The indictments concerned three incidents in which the defendant entertained female guests in his home and served them beverages that also contained a sleeping medication. After drinking the concoction each woman lost consciousness and, in one case, died. In another instance the unconscious victim was sexually assaulted.

On appeal the defendant argues that (1) the manslaughter conviction must be reversed because there was insufficient evidence to establish that his conduct posed a high degree of likelihood that substantial harm would result to another person; (2) the convictions for mingling poison with drink must be reversed because there was no proof that the sleeping medication constituted a poison under the statute; (3) he should have been permitted to introduce character evidence through three witnesses; (4) the indictments were improperly joined; (5) the judge erred in admitting evidence of prior bad conduct; and (6) the manslaughter conviction is inconsistent with the conviction for mingling poison with drink.

*Background.* We summarize the facts the jury could have found. In 1998, at the time of trial, the defendant was a seventy-one year old man who had retired first from the military and then from a position at Polaroid Corporation. He lived alone in an apartment in Randolph. While working on the night shift at Polaroid, in about 1988, he had begun to experience difficulty

sleeping and was prescribed Restoril to remedy the problem.[1] He continued to be prescribed and to use that medication over the next ten years, until at least the time of the last charged offense.

D.K., who was forty-two years old, and E.R., who was seventy-one years old, were friends and neighbors. On the evening of June 7, 1995, they went to the defendant's apartment to socialize. The defendant made each woman an alcoholic drink, and before either had finished a second drink, they both became tired and groggy. At the defendant's request, D.K. reluctantly tried on a mini dress and showed it to him. When she saw E.R. come out of the bathroom clad in a negligee, D.K. thought something was wrong, but because she was experiencing a sense of paralysis, she felt unable to do anything about her concerns. Shortly thereafter, both women lost consciousness.

E.R. and D.K. next remembered waking up about nine hours later, lying next to each other in the defendant's bed. E.R. did not feel well. D.K. still had on the mini dress, but her underwear was on the floor. The defendant drove the women home. E.R. continued to feel very ill and was eventually taken to Quincy Hospital by ambulance. D.K. accompanied her. A blood screen was done at the hospital and benzodiazepine was discovered in blood samples from both women.[2] There was no testimony regarding the likely dosages of the drug the women had been administered.

Rape kits were also prepared at the hospital. E.R.'s rape kit yielded nothing of evidentiary significance, while D.K.'s rape kit revealed the presence of seminal fluid and sperm cells on her underpants. DNA testing could not exclude the defendant as a possible contributor to the genetic material found on the underpants, and statistical analysis showed that about twelve percent of African-Americans could have contributed to the stain on the underpants. The defendant is African-American.

---

[1]Restoril is a prescription medication containing the drug temazepam, a Class C controlled substance. See G. L. c. 94C, § 31. Temazepam is part of the benzodiazepine family of drugs, among which are included Valium and Xanax.

[2]Two years later, Albert Elian, a chemist at the State police crime laboratory, failed to detect the presence of temazepam, the active ingredient in Restoril, when he tested the preserved blood samples from D.K. and E.R. Elian explained that a number of factors might account for the failure to detect the drug on the later date.

When interviewed by police regarding the evening's events, the defendant denied putting drugs of any kind into the drinks he had made for D.K. and E.R. Moreover, he denied having sexual relations with either woman. In all other material respects, he confirmed the accounts of the evening given by D.K. and E.R. The defendant told the police that he took Restoril and gave them two prescription bottles containing the medication. One label on the bottle read, "May cause drowsiness. Alcohol may intensify this effect. Use care when operating a car or dangerous machinery." The other label read, "Caution: Federal law prohibits the transfer of this drug to any person other than the patient for whom it was prescribed."

The second incident occurred on June 14, 1996. On that date, M.N., who was then thirty years old, visited the defendant at his apartment. Over the course of the preceding few weeks, he had been trying to help her find a car to purchase. During the visit, the defendant gave her a drink and she lost consciousness.[3] She woke up the next morning without her bra and wearing a different dress. Her rectal area was painful and dirty. After completing her work shift she went to Carney Hospital.

The hospital screening test for benzodiazepines conducted on M.N.'s blood was negative. Later testing conducted at the State police crime laboratory by chemist Albert Elian detected 4.4 micrograms per deciliter of temazepam in M.N.'s blood, an amount that was too small to be perceived by the screening test done at the hospital. As with E.R. and D.K., there was no testimony as to the dose of temazepam that would have produced the laboratory finding. During the examination that

---

[3]According to M.N., on a prior visit to the defendant's apartment, although she advised him that she did not drink alcohol, he prepared a beverage for her containing "Kahlua with milk." She testified that she became unconscious after consuming the drink. (No indictment was brought with respect to that earlier visit.) When he offered her a beverage during the subsequent June 14 visit, M.N. requested a nonalcoholic drink, and the defendant gave her what she believed to be a "fruit punch." The defendant testified that he "[m]ade her a drink" on that occasion, and on cross-examination, he agreed with the prosecutor's characterization of the beverage as "another drink" (referring back to the Kahlua drink he had prepared on the earlier visit). In his brief, the defendant states that the jury could have found, in the light most favorable to the Commonwealth, that the drinks he prepared for all of the women were of a "similar mixture."

was conducted as the rape kit was prepared, a tear was noted on M.N.'s external genitalia.

The final incident occurred on December 27, 1996. M.P., then fifty-eight years old, had been introduced to the defendant by a mutual friend, and on the night in question, the defendant picked M.P. up at her home. According to M.P.'s daughter, M.P. had had some alcohol to drink before the defendant arrived and when she left with him, she had an overnight bag. The defendant testified that they went to his apartment, they had consensual intercourse, he mixed a couple of alcoholic drinks for her, and she fell asleep on his couch. When he found M.P. unresponsive in the morning he called an ambulance. Emergency personnel arrived and M.P. was pronounced dead at the scene.

The police searched the defendant's apartment the same day and retrieved a bottle of prescription medication. The capsules in the bottle were tested and found to contain temazepam. In addition, the label on the bottle read: "Do not drink alcoholic beverages when taking this medication."

Deoxyribonucleic acid (DNA) analysis of the rectal swab taken from M.P.'s body disclosed genetic material that was consistent with a mixture from M.P. and the defendant. The medical examiner stated that M.P. died from the combined effects of alcohol and temazepam, and that neither the level of alcohol nor the level of temazepam, alone, would have caused the victim's death. M.P.'s blood alcohol content was .22 and her level of temazepam was 98 micrograms per deciliter.

Dr. David Gastfriend, a psychiatrist and chief of addictive services at the Massachusetts General Hospital, testified that 30 milligrams comprises a "full adult dose" of temazepam, but that, starting at age fifty, a therapeutic dose for treating insomnia would be half that dose, or 15 milligrams. He opined that, based on the level of temazepam in M.P.'s blood, she likely had taken 60 to 90 milligrams of the drug the night before. He also testified that, in persons aged fifty or older, temazepam "can tranquilize the brain's sensor for smothering . . . depress the brain's drive to continue breathing," and thus, in such older persons, "there is a risk of essentially stopping breathing . . . with excessive dose." Gastfriend also testified that alcohol taken in conjunction with temazepam does not simply add to

the effect of the drug, but multiplies its impact. As a result, patients who are prescribed temazepam are given strong warnings not to take it with alcohol.

Dr. Alan David Woolf of the Children's Hospital Medical Center, the Massachusetts poison control system, and the Harvard Medical School also testified. He said that the poison control system defines poison or poisoning as "an exposure to a drug or a chemical or a biological compound that injures a human." Woolf explained that, while benzodiazepines are among the regulated drugs that are "fairly safe," they are nevertheless categorized as a "Class 4" substance, which means the drug, or its compounds, can only be dispensed with a prescription from a properly licensed physician. Dr. Woolf said that benzodiazepines generate the third highest number of calls to the poison control center for poisoning by pharmaceuticals. He described their side effects as including drowsiness and impaired consciousness. He, too, stated that there is a synergistic effect when alcohol and temazepam are mixed together.

The defendant testified and denied any sexual contact with D.K., M.N., or E.R. The defendant agreed that he had prepared drinks for D.K., E.R., M.N., and M.P., but denied that he had added any drug to what he served them.[4]

The defendant's DNA expert concluded that the defendant should have been excluded as a source of the genetic material found in D.K.'s underwear and as a source of the sperm fraction of the rectal swab taken from M.P.'s body. The defense toxicologist agreed that temazepam was properly detected in M.N.'s blood sample, but gave an opinion that the tests conducted on the blood samples of D.K., E.R., and M.P. were not conclusive and the positive findings of benzodiazepine in the samples from D.K. and E.R., and of temazepam in M.P.'s blood were not reliable.

1. *Manslaughter.* On appeal the defendant argues that the evidence was insufficient to establish the crime of involuntary manslaughter because it did not establish that the defendant's conduct posed a high degree of likelihood that substantial harm would result to another. The defendant concedes that, viewing

---

[4]See note 3, *supra.*

the evidence in the light most favorable to the Commonwealth, the jury could have found the following facts. After the defendant mixed his prescription medication, Restoril, into an alcoholic drink, he gave the drink to M.P. She drank it and died shortly thereafter. According to the medical examiner, her death resulted from the combined effect of alcohol and the drug temazepam contained in Restoril. The defendant acknowledges that he knew there were at least two labels on the bottle of medication, one warning him that it was a Federal offense to give the drug to anyone else, and a second instructing him not to drink any alcohol when taking the medication. The defendant also concedes in his brief that on the two other occasions, first involving D.K. and E.R. and then M.N., the jury could have found that the other women had fallen asleep when he gave them a "similar mixture."

Relying on these facts, the defendant argues that involuntary manslaughter could not be proven because Restoril is a legally prescribed medication that has numerous legitimate and "fairly safe" uses. Moreover, he argues, there was no label warning him that his conduct created a high degree of likelihood that substantial harm would result to another.

The defendant's argument construes too narrowly the proof required to establish culpable conduct under the crime of involuntary manslaughter. Involuntary manslaughter was explicated many years ago in *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944). As has often been repeated, "involuntary manslaughter includes an unlawful homicide unintentionally caused by wanton or reckless conduct." *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990), citing *Commonwealth* v. *Welansky*, *supra*. "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Welansky*, 316 Mass. at 399. Wanton or reckless conduct is conduct involving a grave risk of harm, undertaken by a person with indifference to or disregard of the consequences of such conduct. *Ibid.* "[E]ven if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of

wanton or reckless conduct . . . if an ordinary normal man under the same circumstances would have realized the gravity of the danger." *Id.* at 398-399. See *Commonwealth* v. *Grey*, 399 Mass. 469, 472 n.4 (1987). Thus, under *Welansky*, "[c]onduct which a reasonable person, in similar circumstances, would recognize as reckless will suffice." *Commonwealth* v. *Catalina*, 407 Mass. at 789.

At the outset, we address the defendant's contention that, because he administered a prescribed medication to his victims, he cannot be considered aware of the risk involved, unlike, for example, the situation involving heroin, which has no currently accepted medical use and which has a high risk of death associated with its use. See *Commonwealth* v. *Catalina*, 407 Mass. at 790. We disagree. An ordinary person would be aware that there are varying risks associated with all prescription medications. It is a matter of both common knowledge and common sense that a prescription is required to obtain certain medications precisely because they contain drugs that are not safe except when administered and supervised by a doctor or other properly licensed practitioner. See 21 U.S.C. § 353(b)(1)(A) (1999) (prescription required because a drug is "not safe for use except under the supervision of a practitioner licensed by law to administer such drug").

Even if we were to assume that an ordinary person was unaware of this fact, a point we highly doubt, a label on the defendant's medication specifically conveyed the same point. The label informed the defendant not to give the drug to anyone else, a statement an ordinary person would have understood to mean that doing so may create a risk of harm.

In addition, the defendant's medication that contributed to M.P.'s death was prescription sleeping pills. Sleeping pills have their own history of risks, independent of those associated with prescription medication. Decisional law sets forth numerous examples that demonstrate our society's familiarity with the fact that the improper use of sleeping pills, whether prescribed or purchased over the counter, may cause death. See *Prudential Ins. Co. of America* v. *Gutowski*, 49 Del. 233, 246 (1955) ("when one voluntarily takes a large overdose of . . . sleeping pills . . . it is common knowledge that death may occur");

*State* v. *Hale*, 65 Wash. App. 752, 757 (1992) (attempted murder shown where mother's act of giving children ten sleeping pills constituted substantial step toward first degree murder). The decisional law, however, is not the only source from which it can be inferred that an individual in today's society would be aware of the risks related to sleeping pills. Our popular culture is replete with references to the dangers associated with the misuse of such medications. See, e.g., Daniel F. Kripke, The Dark Side of Sleeping Pills (1997); Shirley Trickett, Coming Off Tranquilizers, Sleeping Pills and Anti-Depressants (1998).

In this case, however, we are not constrained to decide whether the unauthorized administration of prescription sleeping pills, even in an excessive amount, is sufficient to establish involuntary manslaughter because the defendant mixed the sleeping pills with alcohol and then served the mixture to M.P. The clearly affixed warning on the pill bottle stated that the medication was not to be taken with alcohol. The synergistic effect of mixing alcohol and prescription sleeping medication was explained by two experts at trial. Significantly, the defendant admitted at trial that he was aware of both the warning label and that alcohol enhanced the effects of the medication.[5] An ordinary person would have understood the admonition not to mix the sleeping pills with alcohol as a warning that the combination could be toxic, if not lethal.

Furthermore, the warning label and the expert testimony simply reflected the concern that is all too well known and too often demonstrated in our society, that the combination of sleeping pills and alcohol can be deadly. See generally *Commonwealth* v. *Pettie*, 363 Mass. 836, 838 (1973) (defendant convicted of manslaughter where expert testified that combination of alcohol and sleeping pills would be expected to result in death); *Hickey* v. *Kendall*, 111 Md. App. 577, 607 (1996) ("[I]t is a matter of common knowledge that certain drugs are contraindicated if a patient has recently used alcohol, because the consumption of alcohol is accompanied by well-known psychological and physical side effects"); *Interchange State Bank* v. *Veglia*, 286 N.J. Super. 164, 171 (1995) (indicted

---

[5]He simply denied that he had given any pills to M.P.

corporate executive committed suicide by ingesting vodka and sleeping pills).

We conclude that the defendant's act in surreptitiously mixing his prescription sleeping medication with alcohol and serving the mixture to M.P. demonstrated an indifference to and disregard of the high degree of likelihood that substantial harm would result to her. See *Commonwealth* v. *Welansky*, 316 Mass. at 397, 399. See also *Commonwealth* v. *Scofield*, 360 Pa. Super. 552, 559 (1987) (convictions of reckless endangerment and aggravated assault upheld; defendant driver's ingestion of prescription medication with alcohol was act of intentional recklessness, as "[i]t must be presumed that if [defendant] was ingesting [the drug] pursuant to a doctor's prescription, he had been informed of the danger of driving with such drugs in his system or taking alcohol in combination with the drug[]"). Much like the owner of the New Cocoanut Grove night club (in *Welansky*), who ignored the danger posed by locked exit doors in the event of a fire, the defendant in this case ignored the danger that was posed when he secretly gave M.P. alcohol laced with sleeping pills not prescribed for her. It was enough in *Welansky* "to prove that death resulted from [the defendant's] wanton or reckless disregard of the safety of patrons in the event of fire," 316 Mass. at 401, just as it is enough in this case to prove that death resulted from the defendant's wanton and reckless disregard of M.P.'s health when he gave her a mixture of sleeping pills and alcohol.

2. *Mingling poison with food or drink.* Next, the defendant argues that the evidence was insufficient to establish that temazepam is a poison under G. L. c. 265, § 28. General Laws c. 265, § 28, reads, "Whoever mingles poison with food, drink or medicine with intent to kill or injure another person . . . shall be punished . . . ." Although no definition of poison is included in the statute and no prior Massachusetts decision has elucidated the term as it is used here, the judge gave an instruction that comported with the dictionary definition of poison. The judge instructed the jury that "[t]he word 'poison' means any substance introduced into the body by any means which by its chemical action is capable of causing injury or death." See Webster's Seventh New Collegiate Dictionary 655 (1972) ("a

substance that through its chemical action usually kills, injures, or impairs an organism"); Webster's Third New Int'l Dictionary 1751 (1993) ("a substance [as a drug] that in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism: a substance that through its chemical action usually kills, injures, or impairs an organism"). The judge also instructed the jury that they were to decide "whether Temazepam or benzodiazepines are poisons in this case."

On appeal the defendant does not dispute that the trial judge gave a correct definition of poison, but argues that the term "poison" was not intended to include a legitimate, beneficial prescription medication, even if that medication was used in a manner not contemplated by the drug's manufacturer. According to the defendant, the statute is unconstitutionally broad as applied to him because it did not give him fair notice that temazepam was susceptible of being classified as a poison.

Poison is a broad term that denotes a wide variety of substances. Most commonly viewed as poison are those substances that are so inherently dangerous that no reasonable person under normal circumstances would ingest them. For example, in two of the earliest cases to interpret G. L. c. 265, § 28, and its predecessors, the defendant in each instance used a commercial substance known as "Rough on Rats," an arsenic mixture considered to be a "deadly poison." See *Commonwealth v. Hobbs*, 140 Mass. 443, 446 (1886) (defendant mixed "Rough on Rats" with the meal used to bake the bread of his former landlady); *Commonwealth v. Kennedy*, 170 Mass. 18, 20 (1897) (defendant attempted to combine "Rough on Rats" with the victim's afternoon tea). In addition, certain other substances are viewed as poison. See, e.g., G. L. c. 94B, § 1, as amended through St. 1974, c. 642, § 2 (requiring highly toxic hazardous substances to be labeled with the word "poison"); G. L. c. 132B, § 2, as inserted by St. 1978, c. 3, § 3 (certain pesticides must be labeled with the word "poison").

We recognize however, that there are substances that may have beneficial uses, but when used improperly, may have the capacity to act as a poison. Even the limited decisional law interpreting G. L. c. 265, § 28, and its predecessors, has

recognized that belladonna, a plant that has legitimate medicinal uses, can also constitute a poison. See *Commonwealth* v. *Bearse*, 108 Mass. 487 (1871). See also Webster's Third New Int'l Dictionary 200 (1993) (belladonna defined as a "poisonous plant . . . a medicinal extract from the belladonna plant").

In the case at bar, because of the wide range of appropriate uses for temazepam, it does not fall into the category of a "per se" poison, as does a substance like "Rough on Rats." Indeed, in the Commonwealth's "schedules" of controlled substances, with schedule I being the most dangerous and schedule VI being the least dangerous, temazepam is a "schedule IV" drug, "one of the lower classes of drugs," according to Dr. Woolf, which "has a low potential for abuse . . . [and] has a currently accepted medical use in treatment." See G. L. c. 94C, § 3(4), as inserted by St. 1971, c. 1071, § 1; 105 Code Mass. Regs. § 700.002 (2003); 21 C.F.R. § 1308.14(c) (2001). Dr. Woolf testified that benzodiazepines (of which temazepam is one) are "fairly safe drugs."

The question remains, however, whether its unauthorized and improper use in this case rendered the drug a poison. While temazepam can be safely administered in limited circumstances, there are also dangers associated with its use — thus the requirement that it be used only by prescription under the supervision of a doctor or other duly licensed practitioner. See 21 U.S.C. § 353(b)(1)(A) (1999); G. L. c. 94C, § 17(c). See generally G. L. c. 94C, § 24(f), as amended by St. 1986, c. 434, § 1 (reporting requirement for physicians treating a case of "acute poisoning caused by any controlled substance"). There is no doubt that temazepam, administered improperly, is capable of causing injury, thus acting as a poison. As noted earlier, Dr. Gastfriend testified that, in a person aged fifty or more, "there is a risk of essentially stopping breathing . . . with [an] excessive dose."

In the instant matter, to determine whether temazepam is a poison, we may only consider its effect alone, because, in pertinent part, G. L. c. 265, § 28, requires proof both that the substance used is a poison and that the poison is mingled with drink. It is not sufficient that the substance, although not a poison, produces a poisonous effect when it interacts with the drink to which it is added.

As to the case against the defendant for the poisoning of M.P., Dr. Gastfriend's testimony about the "risk of essentially stopping breathing . . . with [an] excessive dose," together with his opinion that M.P. had been administered sixty to ninety milligrams of the drug — four to six times the therapeutic dose for a person over age fifty — was a sufficient basis from which the jury could infer that the dosage of temazepam administered to her was a poison under the statute. See *Commonwealth* v. *Kennedy*, 170 Mass. 18, 25 (1897) (Holmes, J.) ("[T]he circumstances warranted an inference that [the substance on the cup] was poison. A material fact may be proved by legitimate inference, as well as by direct testimony. . . . Whether a given substance is poison always is matter of inference").

As to D.K., E.R., and M.N., however, the evidence indicates, at best, the toxic effect that can occur when either benzodiazepines or, more specifically, temazepam is combined with alcohol. It is unclear from a review of the evidence what effect such substances, alone, might have had on each of these victims. There is no evidence that the amount of drugs found in the blood of any of them was of sufficient quantity to cause them injury or death. Without such proof the jury could not conclude that the drugs implicated here constituted a poison under G. L. c. 265, § 28.[6]

3. *Character evidence.* The defendant sought to present three character witnesses. The judge conducted a voir dire of each witness and at the conclusion of the voir dire testimony ruled that none of the witnesses provided a sufficient basis from which they could properly testify to the defendant's reputation for truthfulness. The defendant does not contest the correctness of the judge's ruling, but instead urges this court to adopt Proposed Mass.R.Evid. 405(a), which would permit character witnesses to testify not only about the defendant's reputation in the community, but also about their own opinion of the defendant's character. According to the defendant, rule 405 would have

---

[6]Our conclusion here does not have any application to the statute that prohibits drugging persons for sexual intercourse. The language there involves a much broader definition of the substances that come within its scope. See G. L. c. 272, § 3, as appearing in St. 1998, c. 232, § 3 ("any drug, matter or thing" administered "with intent to stupefy or overpower").

more broadly permitted the witnesses to give their own opinion of the defendant's character, provided they were sufficiently familiar with him.

We decline the defendant's request to alter the settled law concerning the admission of character evidence. See *Commonwealth* v. *Baxter*, 267 Mass. 591, 593 (1929); G. L. c. 233, § 21A. Cf. *Burke* v. *Toothaker*, 1 Mass. App. Ct. 234, 239 (1973).

4. *Joinder.* The defendant argues that the judge improperly permitted the Commonwealth to join for trial the indictments related to the three separate incidents at issue here. After conducting a pretrial hearing, the motion judge, who was not the trial judge, concluded that "the offenses charged are related offenses and that the defendant employed the same scheme and a consistent modus operandi in committing the offenses charged."

Rule 9(a)(1) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 859 (1979), allows joinder if the offenses are based on "a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." The facts of this case demonstrate a series of criminal episodes that are sufficiently connected together to support the allowance of the request for joinder. In each episode, the defendant brought women to his home, drugged them with a drink containing a sleeping medication, and then engaged in conduct that could be construed as a sexual assault or an attempted sexual assault. See *Commonwealth* v. *Sullivan*, 436 Mass. 799, 803-805 (2002).

In addition, the judge "properly could conclude that prejudice, if any, to the defendant did not outweigh the interests of the court, the Commonwealth, and the public in a shortened adjudication," *Commonwealth* v. *Helfant*, 398 Mass. 214, 231 (1986), given the substantial scientific testimony that would have had to have been repeated if the motion for joinder had been denied. See *Commonwealth* v. *Sullivan*, 436 Mass. at 803. There was no abuse of discretion in the judge's decision that the crimes were sufficiently related to be tried together. *Ibid.*

5. *Prior bad act.* The judge, over objection, allowed the Commonwealth to introduce testimony from another female

acquaintance of the defendant. She testified that, in November, 1996, she visited the defendant at his apartment. He gave her an alcoholic drink, and after she consumed it, she fell asleep. When she awoke the next morning, her genital area was wet and she had the sensation of having had sexual intercourse. No charges were ever brought with respect to this incident.

On appeal the defendant acknowledges that the evidence was properly admitted to show a common scheme or pattern of conduct under *Commonwealth* v. *Helfant*, 398 Mass. at 224. He argues, however, that its prejudicial effect outweighed its probative value. In the circumstances of this case, we conclude that any prejudice from the testimony of the single witness was sufficiently ameliorated by the judge's limiting instruction, given immediately after the testimony and repeated during the final instructions.

6. *Inconsistent verdicts.* Finally, the defendant argues that his conviction for manslaughter must be reversed because it is legally inconsistent with the conviction for mingling poison with food or drink with the intent to injure or kill under G. L. c. 265, § 28. Legally inconsistent verdicts occur "where, removed from the factual context of the particular case, the government could not possibly have proved the elements of both crimes with respect to the defendant." *Commonwealth* v. *Elliffe*, 47 Mass. App. Ct. 580, 584 (1999).

In this case, the defendant argues that because mingling poison with food or drink requires a specific intent to kill or injure another person, proof of that crime "stands opposed" to the concept within involuntary manslaughter that the killing be unintentional. The argument does not hold up under close scrutiny. The use of the disjunctive "or" in the statute setting forth the elements of mingling poison ("whoever mingles poison . . . with intent to kill or injure") makes clear that the crime may be proved by a showing of either a specific intent to kill *or* a specific intent to injure. The crime of involuntary manslaughter involves an unintentional killing, but the conduct leading to that result must be intended. As stated in *Welansky*, to establish involuntary manslaughter "[w]hat must be intended is the conduct, not the resulting harm." *Commonwealth* v. *Welansky*, 316 Mass. at 398.

The facts before us illustrate this conclusion. The evidence permitted the inference that the defendant gave each of his victims a drink laced with drugs with an intent to induce a state of unconsciousness that would render them unable to fend off or to remember his sexual assaults. As such, the induced state of unconsciousness constituted the intentional injury required to prove the crime of mingling poison. See *Commonwealth* v. *Hammond,* 50 Mass. App. Ct. 171, 175, 176 (2000) (while "the primary meaning of 'injure' [is] to do injustice or wrong to a person," its definition is broad enough to include both physical injury as well as "harm to the mind that a person of normal sensibility would experience when made the victim of [certain crimes]"). The conduct that establishes a violation of G. L. c. 265, § 28, is thus precisely the same conduct that constitutes the act under the manslaughter charge that was done with disregard for the high degree of likelihood that substantial harm would result to that individual.

7. *Disposition.* The judgments are affirmed with the exception of indictments 105815, 105817, and 105818. As to those three indictments, the judgments are reversed, the verdicts set aside, and judgments are to be entered for the defendant.

*So ordered.*